**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

In re: INCOMNET, INC., a California
corporation; In re: INCOMNET
COMMUNICATIONS CORPORATION,
f/k/a National Telephone &
Communications, Inc.,

*Debtors,*

UNIVERSAL SERVICE ADMINISTRATIVE
COMPANY,

*Appellant,*

v.

POST-CONFIRMATION COMMITTEE OF
UNSECURED CREDITORS OF INCOMNET
COMMUNICATIONS CORPORATION,

*Appellee.*

No. 03-56736

BAP No.
CC-03-01064-
LKMo

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Montali, Klein, and Lee, Bankruptcy Judges, Presiding

Argued and Submitted
May 4, 2005—Pasadena, California

Filed September 20, 2006

Before: James R. Browning, Raymond C. Fisher, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

11709

**COUNSEL**

Jonathan T. Cain, Mintz Levin Cohn Ferris Glovsky & Popeo, P.C., Reston, Virginia, for the appellant.

Michael R. Adele, Evan D. Smiley, Kyra E. Andrassy, and Michael J. Heyman, Albert, Weiland & Golden, LLP, Costa Mesa, California, for the appellee.

**OPINION**

BYBEE, Circuit Judge:

In this case we are asked to review the decision of the bankruptcy appellate panel ("BAP"), which held that the Universal Service Administrative Company ("USAC") was a transferee under 11 U.S.C. §§ 547 and 550. We hold that USAC is a transferee under the "dominion" test and affirm the judgment of the BAP.

## I. FACTS AND PROCEEDINGS

Congress passed the "1996 Telecommunications Act . . . to encourage universal telecommunications service." *City of Springfield v. Ostrander* (*In re LAN Tamers, Inc.*), 329 F.3d

204, 206 (1st Cir. 2003). "Universal service includes 'advanced telecommunications and information services,' particularly high-speed internet access, for schools (as well as for libraries and rural health care providers)." *Id.* (quoting 47 U.S.C. § 254(b)(6), (h)(1) (2000)). To this end, the Telecommunications Act of 1996 ("Telecommunications Act") requires telecommunications carriers providing interstate telecommunications services to financially support the cost of providing telecommunications services to schools, libraries, health-care providers, low-income consumers, and subscribers in high-cost areas. *See* 47 U.S.C. § 254(b) (2000); *see also id.* § 254(d) ("Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service."). The telecommunications companies pass this cost through to their subscribers; the charge generally appears on phone bills as the "Universal Service Fund Fee."

Each telecommunications carrier is required by law to contribute to the Universal Support Fund ("USF") based on its interstate and international telecommunications revenue. *See* 47 C.F.R. § 54.709(a) (2005). The Federal Communications Commission ("FCC") devises a formula that each carrier must adhere to in calculating its contribution. The USF contributions are not defined as federal funds; however, they exist because of a federal mandate. *In re LAN Tamers, Inc.*, 329 F.3d at 206; *see also Tex. Office of Pub. Util. Council v. FCC*, 183 F.3d 393, 405-09 (5th Cir. 1999) (describing the history and universal service goal of the Telecommunications Act and subsequent implementing regulations); *In re LAN Tamers, Inc.*, 329 F.3d at 206-07 (describing certain portions of the USAC structure in conjunction with the E-Rate program implementing USF financial support for schools and libraries); Robert M. Frieden, *Universal Service: When Technologies Converge and Regulatory Models Diverge*, 13 HARV. J.L. & TECH. 395, 397-422 (2000) (describing the Telecom-

munications Act's "universal service mission" and its impact). The universal service fund is then disbursed to subsidize the costs of telecommunications services for the beneficiaries of the Act (e.g., schools, libraries, and rural health care providers).[1] All disbursements from the USF are made to carriers.[2]

Congress gave the FCC the authority to implement the universal service support provisions of the Telecommunications Act and mandated that it do so. Pursuant to this authority, the FCC designated USAC, a non-profit corporation incorporated in Delaware, to collect, pool, and disburse the universal service support funds contributed by carriers pursuant to 47 U.S.C. § 254(d). 47 C.F.R. § 54.701(a) (2005) ("The Universal Service Administrative Company is appointed the permanent Administrator of the federal universal service support mechanisms . . . ."); *see also id.* § 54.5 ("The term 'Administrator' shall refer to the Universal Service Administrative Company that . . . has been appointed the permanent Administrator of the federal universal service support mechanisms."). All of USAC's operations are carried out pursuant to regulations promulgated by the FCC. *See id.* §§ 54.701, 54.702.

Incomnet Communications Corporation ("Incomnet") was a telecommunications carrier subject to universal service support contribution requirements under FCC regulations. Pursuant to FCC rules, USAC billed and collected USF

---

[1] This generally takes the form of payments made to carriers on behalf of a beneficiary, reducing the amount the beneficiary must pay. However, under certain circumstances, a beneficiary may pay the carrier directly and subsequently be reimbursed out of the USF. *See In re LAN Tamers*, 329 F.3d at 207.

[2] *See* 47 U.S.C. § 254(e) (2000) ("[O]nly an eligible telecommunications carrier . . . shall be eligible to receive specific Federal universal service support."); *see also In re LAN Tamers*, 329 F.3d at 206-07. Even when a beneficiary is reimbursed for payments it has already made to a carrier, the USF funds are disbursed to the carrier, who is then legally obligated to remit that amount to the beneficiary.

contributions from Incomnet during the months of June, July, and August 1999. The contributions for those three months totaled $470,161.52, and USAC deposited Incomnet's contributions in the USF along with contributions from other carriers.

Incomnet filed for Chapter 11 bankruptcy on September 2, 1999.[3] The Post-Confirmation Committee of Unsecured Creditors of Incomnet Communications Corporation ("Committee") was appointed trustee of Incomnet's estate on May 9, 2000. The Committee filed a complaint against USAC in federal bankruptcy court, alleging that the $470,161.52 paid by Incomnet to USAC in June, July, and August of 1999 constituted a preferential transfer made within the ninety days preceding Incomnet's bankruptcy petition. Arguing that USAC was a transferee under 11 U.S.C. §§ 547 and 550(a), the Committee sought to recover these universal service support contributions and requested that USAC reimburse these payments to Incomnet. The Committee also sought to prevent USAC from making any further claims on Incomnet's estate.

USAC admitted that it had received a total of $470,161.52 in universal service support contributions from Incomnet through three payments in June, July, and August of 1999, respectively. However, it contended that it was not a transferee under 11 U.S.C. § 550(a), but was instead a mere conduit for the funds, and moved for summary judgment on that ground.

The Committee filed objections to USAC's motion for summary judgment and subsequently moved for summary

---

[3]On January 7, 2000, USAC filed a proof of claim as a creditor against Incomnet. In doing so, USAC sought to recover $545,142.11, in addition to the contributions Incomnet had already made to the USF, from Incomnet for its "Federal Universal Service Obligation." That claim is not at issue in the instant case, and it is unclear from the pleadings and the record as to whether USAC has abandoned this claim.

judgment on its first cause of action, the preferential transfer. It argued that uncontroverted evidence established that USAC's receipt of the funds from Incomnet met all of the requirements of 11 U.S.C. § 547(b).

Purporting to apply the test we announced in *Danning v. Miller* (*In re Bullion Reserve of North America*), 922 F.2d 544, 549 (9th Cir. 1991), which the bankruptcy court labeled the "dominion or control" test, the bankruptcy court found that USAC did not have dominion or control over the USF. The bankruptcy court held that "USAC [did] not have the requisite degree of unfettered control over the [USF] to qualify as a transferee" under 11 U.S.C. §§ 547 and 550 and granted USAC's motion for summary judgment. [E.R. 22.]

The Committee appealed to the Ninth Circuit Bankruptcy Appellate Panel ("BAP"). The BAP reversed the bankruptcy court's grant of summary judgment in favor of USAC, holding that USAC was a transferee under 11 U.S.C. § 550(a) because it was the actual recipient of the transfer. *See Post-Confirmation Comm. v. Universal Serv. Admin. Co.* (*In re Incomnet Commc'ns Corp.*), 299 B.R. 574, 581 (B.A.P. 9th Cir. 2003). The BAP held that the "dominion or control" test did not apply because it was adopted to distinguish financial intermediaries from true recipients, and that the USAC transaction could not be a "conduit" transfer because it did not involve a two-step transaction. *See id.* at 578, 580. USAC filed this appeal.

## II.   STANDARD OF REVIEW

We review the BAP's conclusion of law de novo. *Cool Fuel, Inc. v. Bd. of Equalization of Cal.* (*In re Cool Fuel, Inc.*), 210 F.3d 999, 1001 (9th Cir. 2000). "Because we are in as good a position as the BAP to review bankruptcy court rulings, we independently examine the bankruptcy court's decision, reviewing the bankruptcy court's interpretation of the Bankruptcy Code de novo and its factual findings for clear

error." *United States v. Hatton* (*In re Hatton*), 220 F.3d 1057, 1059 (9th Cir. 2000); *see also Ehrenberg v. Cal. State Univ., Fullerton Found.* (*In re Beachport Entm't*), 396 F.3d 1083, 1086 (9th Cir. 2005); *Tex. Comptroller of Pub. Accounts v. Megafoods Stores, Inc.* (*In re Megafoods Stores, Inc.*), 163 F.3d 1063, 1067 (9th Cir. 1998). A bankruptcy court's summary judgment order is reviewed de novo. *Paulman v. Gateway Venture Partners III, L.P.* (*In re Filtercorp, Inc.*), 163 F.3d 570, 578 (9th Cir. 1998); *see also In re Bullion Reserve*, 922 F.2d at 546.

## III.   ANALYSIS

A.   *Statutory Framework and the "Dominion" Test*

**[1]** The trustee of a bankrupt debtor's estate can seek to avoid and recover preferential transfers pursuant to 11 U.S.C. §§ 547 and 550. Section 547 reads, in relevant part:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> > (1) to or for the benefit of a creditor;
> >
> > (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> >
> > (3) made while the debtor was insolvent;
> >
> > (4) made—
> >
> > > (A) on or within 90 days before the date of the filing of the petition [and] . . . .
> >
> > (5) that enables such creditor to receive more than such creditor would receive if—

> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (2000 & Supp. 2005). The trustee, in this case the Committee, "has the burden of proving the avoidability of the transfer under [11 U.S.C. § 547(b)]," *id.* § 547(g), but is aided by a presumption that the debtor is insolvent during the ninety days preceding the filing of the Chapter 11 petition, *id.* § 547(f). Subsections (c) and (i), which create exceptions to the provisions of § 547(b), have not yet been considered by the bankruptcy court and thus are not before us on appeal.[4]

   **[2]** When, pursuant to § 547, a trustee avoids a transfer within ninety days of the debtor's filing Chapter 11, § 550(a) provides for recovery from the transferee:

> [T]o the extent that a transfer is avoided under section [547] . . . , the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
>> (1)  the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>>
>> (2)  any immediate or mediate transferee of such initial transferee.

---

[4]Specifically, § 547(i) addresses transfers made for the benefit of insiders, and § 547(c) provides certain exceptions that enable a transferee to prevent avoidance.

11 U.S.C. § 550(a) (2000). Under § 550(a), "[t]he trustee's right to recover from an initial transferee is absolute." *Schafer v. Las Vegas Hilton Corp.* (*In re Video Depot, Ltd.*), 127 F.3d 1195, 1197-98 (9th Cir. 1997); *In re Bullion Reserve*, 922 F.2d at 546-47.

Because the bankruptcy court ruled that USAC was not a transferee, it did not decide whether all of the elements of § 547(b) had been met in this case or whether USAC has a valid defense to avoidance under any other statutory provision. Thus, the issue before us is a narrow one: Whether USAC is an "initial transferee."

**[3]** Section 550(a) does not define the phrase "initial transferee." In the absence of a clear statutory definition, two standards to determine whether a party is an "initial transferee" have emerged: the "dominion test" and the "control test." While the words "dominion" and "control" are synonyms when used in their lay sense, the "dominion test" and the "control test," as originally stated, are not merely different names for the same inquiry. As we discuss below, the two tests do differ, and the fact that the dominion test is sometimes stated as an inquiry into who had legal "control" over funds does not mean that the two standards are indistinguishable. While we have not always been careful with our terms, we have applied the dominion test several times, but have declined to adopt the control test. *See, e.g.*, *Abele v. Modern Fin. Plans Servs., Inc.* (*In re Cohen*), 300 F.3d 1097, 1102 n.2 (9th Cir. 2002) ("Contrary to the BAP, the district court, and [appellee's] contentions, we have not explicitly adopted the 'control test' . . . . In this case we *again rely exclusively* upon the 'dominion test' . . . .") (emphasis added) (internal citations omitted); *In re Bullion Reserve*, 922 F.2d at 548-49 (discussing both the dominion test and the control test but ultimately selecting and relying exclusively on the "dominion test"). Although the resolution of this case does not turn on the question of which of these two standards governs in this circuit,

we address this question at some length in an effort to clarify a somewhat murky area of our jurisprudence.[5]

Under the dominion test, "a transferee is one who . . . has 'dominion over the money or other asset, the right to put the money to one's own purposes.' " *In re Cohen*, 300 F.3d at 1102 (citing *Bonded Fin. Servs. Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)); *see also In re Video Depot, Ltd.*, 127 F.3d at 1198; *In re Bullion Reserve*, 922 F.2d at 548. The inquiry focuses on whether an entity had legal authority over the money and the right to use the money however it wished. *See In re Cohen*, 300 F.3d at 1102; *Bonded Fin. Servs.*, 838 F.2d at 893-94.

The leading case in this area is the Seventh Circuit's decision in *Bonded Financial Services*. In *Bonded Financial Services*, a debtor sent a bank a check payable to the bank's order with a note directing the bank to deposit the check into an account that belonged to Michael Ryan, the person who controlled the debtor. *Id.* at 891. The bank deposited the check in Ryan's account, and Ryan subsequently requested that the bank debit his account in the amount received in order to reduce the outstanding balance on a loan he owed to the bank. *Id.* The debtor later declared bankruptcy, and the trustee of his bankruptcy estate sought to avoid the transfer. *Id.* He argued that because the bank was the payee of the check, it was the initial transferee under § 550(a)(1). *Id.* The Seventh Circuit held that the bank was not an initial transferee because it received no benefit from the initial transaction, in which it acted as a financial intermediary without dominion over the money. "When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded." *Id.* at 893.[6] Only after a second and separate transaction, where

---

[5]For example, the bankruptcy court below applied the "dominion or control" test that it believed we had adopted in *In re Bullion Reserve*.

[6]The Seventh Circuit acknowledged that, at the time, courts had not uniformly adopted this interpretation of the statute:

Ryan instructed the bank to debit his account in the amount of the transfer from the debtor, did the bank have dominion over the money. *Id.* at 893-94. The "dominion test" stressed the ability of the recipient to use the money as it saw fit.

The Eleventh Circuit took a slightly different approach when it laid out the "control test," under which courts view the entire transaction as a whole to determine who truly had control of the money. *See Nordberg v. Societe Generale* (*In re Chase & Sanborn Corp.*), 848 F.2d 1196, 1199 (11th Cir. 1988). In that case, the trustee sought to avoid a fraudulent transfer made to a bank to cover an overdrafted account. *See id.* at 1197-98. The Eleventh Circuit stated that "[t]he control test . . . simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable."[7] *Id.* at 1199. The court concluded that the bank's transaction did not fall within the scope of avoidable transfers because it acted as a conduit. *Id.* at 1201-02. The "control test" was born out of the statement that "the

---

We are aware that some courts say that an agent (or a bank in a case like ours) is an "initial transferee" but that courts may excuse the transferee from repaying using equitable powers. This is misleading. "Transferee" is not a self-defining term; it must mean something different from "possessor" or "holder" or "agent". To treat "transferee" as "anyone who touches the money" and then to escape the absurd results that follow is to introduce useless steps; we slice these off with Occam's Razor and leave a more functional rule.

*Id.* at 894 (citations omitted).

[7]It is interesting to note just how starkly the Eleventh Circuit's reliance on equity, exemplified by the direct incorporation of equitable principles into the control test, contrasts with the approach taken by the Seventh Circuit in *Bonded Financial Services*. In its opinion, the Seventh Circuit expressed concern over "the use of equitable powers under § 550(a)" by a number of bankruptcy courts and remarked on "the propriety of judges' declining to enforce statutes that produce inequitable results." 838 F.2d at 894. The court also expressed dismay at courts using equity to relieve certain actors from a literal construction of § 550. *Id.*

outcome of the cases turn on whether the banks actually controlled the funds or merely served as conduits, holding money that was in fact controlled by either the transferor or the real transferee." *Id*. at 1200.

A number of circuits combined these tests—or at least combined their names—creating a "dominion and control test" to determine whether a party is an initial transferee. *See, e.g.*, *Bailey v. Big Sky Motors, Ltd.* (*In re Ogden*), 314 F.3d 1190, 1202 (10th Cir. 2002) (applying the "dominion and control test" of *Bonded Financial Services*, while also citing to *In Re Chase & Sanborn Corp.*); *Christy v. Alexander & Alexander of N.Y. Inc.* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*), 130 F.3d 52, 57-58 (2d Cir. 1997) (stating that in *In re Chase & Sanborn Corp.*, the Eleventh Circuit had adopted the logic of the Seventh Circuit in *Bonded Financial Services*, and "join[ing] these other circuits in adopting the 'mere conduit' test"); *Bowers v. Atlanta Motor Speedway, Inc.* (*In re Se. Hotel Props. Ltd.*), 99 F.3d 151, 156 (4th Cir. 1996) ("[W]e explicitly adopt the dominion and control test as set forth in *Bonded* [*Financial Services*]. We hold further that this test requires that in order to constitute the 'initial transferee' of property under § 550(a) of the Bankruptcy Code, a person or entity must have exercised legal dominion and control over the property."); *Sec. First Nat'l Bank v. Brunson* (*In re Coutee*), 984 F.2d 138, 140-41 (5th Cir. 1993) (relying on both *Bonded Financial Services* and *In re Chase & Sanborn Corp.* in adopting the "dominion or control" test); *First Nat'l Bank of Barnesville v. Rafoth* (*In re Baker & Getty Fin. Servs., Inc.*), 974 F.2d 712, 722 (6th Cir. 1992) (quoting a party's characterization of *Bonded Financial Services* as establishing a "dominion or control" test and applying same).

**[4]** Thus, we see that while the two inquiries are similar, they are not indistinguishable: The dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit. *See Bonded Fin. Servs.*, 838

F.2d at 893-94. The control test takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question. *In re Chase & Sanborn Corp.*, 848 F.2d at 1199. Since we have explicitly adopted the "more restrictive 'dominion test,' " set out in *Bonded Financial Services*, *In re Cohen*, 300 F.3d at 1102 n.2, we take care not to apply the more lenient "control test" put forth in *In re Chase & Sanborn Corp.*

B.  *Application of the Dominion Test to USAC*

We next consider USAC and the FCC's legally prescribed roles in the administration of the USF. While we recognize that the FCC does hold substantial power over the fund indirectly, essentially by overseeing USAC, we also recognize that it has no ability to control the USF through direct seizure or discretionary spending. We hold that USAC, which, as administrator of the USF, has discretion over if, when, and how it disburses universal service funds to beneficiaries, holds dominion over the USF. Accordingly, we hold that USAC is the initial transferee and affirm the judgment of the BAP.

USAC has a board of directors ("Board") and a chief executive officer. Both telecommunications carriers and USF beneficiaries submit nominations for the Board to the Chairman of the FCC, who selects USAC's directors. 47 C.F.R. § 54.703(c). The Board nominates USAC's chief executive officer by consensus, but he must be approved by the Chairman of the FCC. *Id*. § 54.704(b). FCC regulations establish Board committees that oversee USAC's distribution of the USF to various categories of beneficiaries. *Id*. § 54.705.

The FCC has responsibility for implementing and regulating the collection and distribution of the USF. *See Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 406 (5th Cir. 1999); *see also* 47 U.S.C. § 254(a) (2000); *cf. In re LAN Tamers, Inc.*, 329 F.3d at 206. The FCC specifies eligibility

requirements for universal service support funds and establishes policy. *See, e.g.*, 47 C.F.R. § 54.101 (listing supported services for rural, insular, and high-cost areas); *id.* § 54.201 (generally defining eligible telecommunications carriers); *id.* § 54.202 (listing additional eligibility requirements for telecommunications carriers); *see also id.* § 54.702(c) (requiring USAC to seek guidance from the FCC when the Telecommunications Act or rules that it must follow are unclear). The FCC must approve USAC's total projected expenses and budget on a quarterly basis. *Id.* § 54.709(a)(3).

USAC is prohibited from "mak[ing] policy, interpret[ing] unclear provisions of the statute or rules, or interpret[ing] the intent of Congress." *Id.* § 54.702(c). "Where the [provisions of the Telecommunications Act] or the [FCC's] rules are unclear, or do not address a particular situation, [USAC must] seek guidance from the [FCC]." *Id.* The FCC retains the authority to overrule USAC's actions in administering the universal service support funds; those who are aggrieved by USAC, its committees, or its Board may seek review from the FCC. *Id.* § 54.719(c).

Telecommunications carriers' contributions to USAC are based both on the end-user telecommunications revenues they report to the FCC and on a "contribution factor" that the FCC determines quarterly. *Id.* § 54.709(a). USAC calculates the payment due from each individual carrier by multiplying that carrier's revenues by the FCC-approved quarterly contribution factor. *See id.* § 54.709(a)(3). If a carrier fails to make timely payments, USAC generates an invoice for the amount of the required contribution and sends it to the carrier. *Id.* § 54.713.

USAC takes legal title to the contributions it receives from carriers and deposits them into the USF, then disburses funds to subsidize the provision of service to libraries, schools, rural areas, and high-cost areas. USAC requires potential beneficiaries to fill out the correct forms, meet deadlines, and receive

proper certification; USAC is prohibited from subsidizing entities that are not certified or that do not meet specific criteria. *Id.* §§ 54.313, 314 (high-cost support certification and criteria); *id.* § 54.501 (eligibility requirements for schools and libraries); *id.* § 54.601 (eligibility requirements for rural health care providers). FCC regulations require USAC to file an annual report with the FCC and Congress that includes information on operations, activities, participation, administrative costs, and payments. *Id.* § 54.702(g). USAC is also required to consult with FCC staff regarding the scope and content of its annual report. *Id.*

Citing the restrictions under which it operates and its concomitant limited discretion, USAC contends that it was a mere conduit for the contributions it received from Incomnet. It then points to our statement in *In re Bullion Reserve* that "it would be 'inequitable' to allow recovery against an entity merely because it had 'technically . . . received the funds . . . ,' if the entity had 'never actually *controlled* the funds.' " 922 F.2d at 549 (omissions in original) (quoting *In re Chase & Sanborn Corp.*, 848 F.2d at 1200). USAC argues that because it merely possessed the funds in accordance with federal law, serving as a conduit to telecommunications carriers that provide service to FCC-designated beneficiaries, it is not an initial transferee. It maintains that it did not acquire "dominion over the money . . . [or] the right to put the money to [its] own purposes," and was not "free to invest the whole [amount] in lottery tickets or uranium stocks." *Bonded Fin. Servs.*, 838 F.2d at 893-94. USAC claims that its status as a mere conduit renders Incomnet's universal service support payments unavoidable; therefore, the Committee is not entitled to reimbursement.

The Committee argues that since USAC holds legal title to the funds and deposits the USF into its own bank accounts, it satisfies the plain meaning of "transferee" and the Committee has carried its burden.[8] The Committee argues that USAC

---

[8]The Committee further argues that the "dominion and control" defense (or, more appropriately, the "conduit defense") is an equitable affirmative

cannot be a conduit when its administrator has the right to use the money collected to accomplish the purposes of the fund. The Committee also asserts that even though USAC is subject to federal regulations that dictate how the USF is to be disbursed, these regulations do not make USAC a mere conduit entitled to avoid transferee liability.

We agree with the BAP that USAC is a "transferee" for purposes of 11 U.S.C. §§ 547 and 550. USAC is neither an agent nor a mere conduit for some other party; indeed, three months after Incomnet filed for Chapter 11 protection, USAC filed its own proof of claim as a creditor for more than $500,000 in additional universal service obligations owed under the Telecommunications Act.[9] As USAC conceded before the bankruptcy court, it holds legal title to the funds in the USF accounts.

**[5]** The dominion test we have crafted strongly correlates with legal title. In *In re Cohen*, we described "[d]ominion . . . [as] akin to legal control (e.g., the right to invest the funds as one chooses)" and distinguished this from "mere possession."[10] *In re Cohen*, 300 F.3d at 1102. In the vast majority of cases, possessing legal title to funds will equate to having dominion over them.[11] The focus on "dominion" is useful for those

---

defense, and that USAC bears the burden of proving this defense applies. We decline to adopt this view. The clear language of 11 U.S.C. § 547(g) states that "the trustee has the burden of proving the avoidability of a transfer under [§ 547(b)]."

[9]It is not obvious that USAC could assert such a claim against Incomnet if, as USAC argues, it were only a "mere conduit."

[10]The fact that the dominion test is sometimes stated as an inquiry into who had legal "control" over funds does not mean that the dominion test is the same as the control test. As we have discussed above, the two tests do differ, and when control is used in the context of stating the dominion test, it is merely used in its lay sense.

[11]We are sympathetic to the BAP's concerns that, by focusing on whether a party had dominion over funds, courts may lose track of the

unusual situations in which legal title to funds and the right to put those funds to use have been separated. There are two primary cases when this may occur: (1) when an entity has legal title as a formal matter, but legally does not have any discretion in the application of funds; and (2) when an entity does not possess legal title, but nevertheless has sufficient authority over the funds to direct their disbursement.

To illustrate the first case, consider a bank that receives currency from a depositor with instructions to deposit those funds into the account of a third party. In such a case, the bank will initially take title over the depositor's funds, but it will not have dominion over them because it has no discretion over the uses to which the depositor's money is to be put. Thus, the bank is not the transferee, but the conduit or agent for a general deposit.[12]

---

original question proposed by the statute—namely, whether a party is a transferee. Cases involving financial intermediaries—or, as the BAP calls them, "conduit cases"—are the most likely to fall into the narrow set of circumstances where the identity of the transferee is sufficiently unclear as to require the application of the dominion test. This observation notwithstanding, the dominion test remains a test to determine whether a recipient of funds is a transferee for purposes of the bankruptcy code, and this inquiry is not limited to the context of "conduit cases."

[12]If the third party subsequently gives that money to the bank to reduce its own debt, the bank will then have dominion and legal title, but in such a case the bank is a transferee of funds from the third party, not from the initial depositor. *See Bonded Fin. Servs.*, 838 F.2d at 892-94 (distinguishing the case of a bank receiving a check from a depositor with instructions to reduce the balance of a third party's loan to the bank from the case of a bank receiving a check with instructions to deposit it into the account of a third party who subsequently orders the bank to debit the account to reduce a loan he owes to the bank). *See generally Parker v. Cmty. First Bank* (*In re Bakersfield Westar Ambulance, Inc.*), 123 F.3d 1243, 1246 (9th Cir. 1997) ("By depositing money into a bank account, the depositor enters a debtor-creditor relationship with the bank. Title to the funds passes to the bank, and the depositor receives a contract claim against the bank for an amount equal to the account balance." (citations omitted)); MICHIE ON BANKS AND BANKING ch. 9, § 38 (Matthew Bender & Co. eds.) (2003) ("When [an] account holder makes a deposit into [a] bank account, title to the money is transferred to the bank and [a] creditor-debtor relationship is formed.").

The second scenario, where an entity lacks legal title to funds, but nevertheless has power over them, may be illustrated by a trustee who is able to direct the disbursement of the funds in a trust account he manages, even though he does not own them. Such a trustee would therefore exercise dominion over the funds without holding title to them. *See Kupetz v. United States* (*In re Cal. Trade Technical Sch., Inc.*), 923 F.2d 641, 649 (9th Cir. 1991) ("[T]reating a transfer to [the Department of Education's ('DOE')] trust fund as equivalent to a transfer to DOE is entirely consistent with the Seventh Circuit's decision in *Bonded Financial Services* . . . ." ); *id.* ("Our treatment of the . . . transfer to the trust as a transfer to or for the benefit of DOE under section 547(b)(1) renders DOE an initial transferee, or an entity for whose benefit the initial transfer was made under section 550(a)(1).").

**[6]** USAC is the designated administrator of the USF. 47 C.F.R. §§ 54.5, 54.701(a), § 54.801 (2005). While the FCC has substantial authority to determine USAC's budget and approve its disbursements, *see id.* § 54.709(a)(3), USAC is not simply holding funds in the USF as the FCC's agent. The FCC only exercises power over the fund indirectly, essentially by overseeing USAC; it has no ability to control the funds in the USF through direct seizure or discretionary spending. *See id.* § 54.715(c) ("[USAC] shall submit to the [FCC] projected quarterly budgets at least sixty (60) days prior to the start of every quarter. The [FCC] must approve the projected quarterly budgets before [USAC] disburses funds under the federal universal service support mechanisms."); *cf. Richardson v. FDIC* (*In re M. Blackburn Mitchell, Inc.*), 164 B.R. 117, 125 (Bankr. N.D. Cal. 1994) ("The FDIC obtained full dominion and control over the funds with the right to put the money to its own purposes; it was not holding those funds in trust, or as agent, for any other party."); *id.* at 130 ("The FDIC had full use of those funds for its own account.").

**[7]** Nor is USAC a mere conduit of universal support funds to the carriers who provide telecommunications services to

the beneficiaries of the Telecommunications Act. Although USAC is obligated by law to spend those funds for designated, highly regulated purposes, USAC is neither the agent of, nor a trustee for, carrier recipients. USAC is charged with establishing a budget that meets the purpose of the statute, but neither the specific recipients nor the specific beneficiaries are named in that statute. *See* 47 U.S.C. § 254 (2000); 47 C.F.R. § 54.101 (2005) (specifying requirements carriers must meet to be eligible to receive USF disbursements); *id.* §§ 54.301-.316, 54.400-.417, 54.500-.523, 54.600-.625 (specifying eligibility requirements for USF beneficiaries).

[8] Similarly, USAC has not established that there is any binding legal relationship between it and any of the USF's beneficiaries. The statute establishing the universal service support contributions and the regulations implementing the statute do not name specific beneficiaries of the USF, nor do they designate USAC to be a mere agent of these beneficiaries, charged with funneling telecommunications carriers' contributions to them. Federal law obligates carriers to pay their contributions *to* USAC, which then distributes them pursuant to its legal mandate; carriers do not pay the universal service beneficiaries *through* USAC. USAC is a distinct legal entity that takes control over the funds, pools them together, and distributes them; it is more than a mere conduit for contributions.

[9] Finally, it is of no consequence that USAC cannot invest funds in—to use the Seventh Circuit's colorful phrase—"lottery tickets or uranium stocks." *See Bonded Fin. Servs., Inc.*, 838 F.2d at 894. Here, USAC received the funds from Incomnet without any restrictions *from Incomnet* on their use. USAC commanded those funds and, like other individuals, its use of those funds was restricted by law. These legal restrictions merely limit how USAC will exercise its dominion over the funds; they do not preclude USAC from having dominion at all.

In cases from within our circuit, other government entities have been found to be initial transferees even though they were subject to statutes and regulations governing their use of the funds given them. For example, in *In re California Trade Technical Schools, Inc.*, 923 F.2d 641, California Trade Technical Schools ("CTTS") received federal financial aid funds from the Department of Education. CTTS was obligated to hold these funds in trust for student recipients, but it improperly diverted them to operating expenses. The Department of Education demanded return of the diverted funds. *See id.* at 645. When CTTS made payments to the Department of Education to correct this, we treated the department as the initial transferee of the repaid funds, even though the funds might be obligated to specific students in the future. *Id.* at 647 & n.9. Similarly, in *In re M. Blackburn Mitchell, Inc.*, 164 B.R. at 130, and *Kupetz v. United States* (*In re Williams*), 104 B.R. 296, 298 (Bankr. C.D. Cal. 1989), debtors had made payments to the FDIC and the IRS, respectively, and bankruptcy courts in California found these agencies to be initial transferees under 11 U.S.C. § 550(a)(1).

Each of these entities—the Department of Education, the FDIC, and the IRS—was unable to "purchase lottery tickets or uranium stocks" with its funds because of government regulations, yet this did not prevent courts from holding that each was an initial transferee under 11 U.S.C. § 550(a)(1). Thus, the fact that USAC can only spend the USF in accordance with certain federal regulations does not necessarily mean that it is not a transferee. USAC sets its own budget and, subject to FCC approval, it has wide discretion. Although it can only choose its beneficiaries from a limited menu of entities, and the FCC has some veto power over its budget, USAC, as administrator of the USF, decides if, when, and how it disburses funds on behalf of the USF's beneficiaries. *See* 47 C.F.R. §§ 54.701(a), 54.704(a), 54.705, 54.715 (2005).

**[10]** In sum, some entity must have dominion over the USF; we hold that USAC is this entity. Because USAC had

dominion over the USF, we hold that it had dominion over Incomnet's universal service support contributions and that it is therefore a transferee under 11 U.S.C. § 550(a)(1).

## IV.   CONCLUSION

We affirm the judgment of the BAP, and hold that USAC is a transferee under 11 U.S.C. §§ 547 and 550(a)(1). We remand to the bankruptcy court for further proceedings.

AFFIRMED.