**ORDERED PUBLISHED**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. NC-11-1173-DoDH |
| JOSEPH J. VIOLA aka GIUSEPPE VIOLA, | Bk. No. 10-30904 |
| Debtor. | Adv. No. 10-03103 |
| JANINA M. HOSKINS, Chapter 7 Trustee, | |
| Appellant, | |
| v. | **O P I N I O N** |
| CITIGROUP, INC.; CITIGROUP GLOBAL MARKETS, INC.; CITIBANK, N.A., | |
| Appellees. | |

Argued and Submitted on January 20, 2012
at San Francisco, California

Filed - April 6, 2012

Appeal from the United States Bankruptcy Court
for the Northern District of California

Hon. Dennis Montali, Bankruptcy Judge, Presiding.


Appearances:   John H. MacConaghy of MacConaghy & Barnier argued
for the appellant.  Stefan Perovich of Keesal,
Young & Logan argued for the appellees.

Before:  DONOVAN,[1] DUNN, and HOLLOWELL, Bankruptcy Judges.

---

[1]  Hon. Thomas B. Donovan, United States Bankruptcy Judge for the Central District of California, sitting by designation.

DONOVAN, Bankruptcy Judge:

Janina M. Hoskins (Hoskins), chapter 7 trustee for the estate of Joseph Viola (Viola), appeals an order of the bankruptcy court dismissing with prejudice Hoskins' Second Amended Complaint against Citigroup, Inc. (Citigroup), Citigroup Global Markets, Inc. (CGMI), and Citibank, N.A. (Citibank), (collectively Citi), for avoidance of fraudulent transfers and damages for aiding and abetting intentionally fraudulent transfers. We AFFIRM the dismissal.

## I.  FACTS

Viola, a convicted felon and fugitive from justice, approached a San Francisco branch of Citibank managed by vice president Rik B. Schrammel on or about April 14, 1999.[2] Citibank was apparently Viola's bank of choice; his prior conviction arose out of fraudulent activities in Arizona involving Citibank accounts, and he was investigated by Citibank internal fraud personnel in relation to those activities. Despite this past investigation, Viola and Ralph Napolitano, a retired auto mechanic, were permitted to open an account at Citibank in the name of "The Ralph Napolitano Irrevocable Living Trust DTD April 13, 1999." The Account Opening Form indicated that Napolitano earned $25,000 per year and had an entire net

---

[2] All facts are drawn from allegations raised in Hoskins' Second Amended Complaint, and are taken as true for the purposes of reviewing the bankruptcy court's dismissal of Hoskins' complaint for failure to state a claim. See Stoll v. Quintanar (In re Stoll), 252 B.R. 492, 495 (9th Cir. BAP 2000).

worth of $220,000. Under the terms of the trust, which was executed and notarized in the presence of Schrammel, Viola had full power of attorney for Napolitano, Viola and Napolitano were co-trustees of Napolitano's affairs, and Schrammel was designated as successor trustee. Viola and Napolitano also opened an investment brokerage account in the name of the trust.

Napolitano died in 2000. However, the funds in the trust accounts were not distributed to his chosen beneficiaries. Instead, beginning around January 1, 2005, Viola began using the trust accounts to operate a Ponzi scheme. In that year, the balance in the trust accounts grew from approximately $362,000 to $771,000, with the increase due almost entirely to funds obtained from Ponzi scheme victims. Viola successfully represented to at least sixty investors that he was an experienced securities and commodities trader and promised generous investment returns. Based on these representations, these investors entrusted him with roughly $17 million.

Over the course of the scheme, Viola used the funds invested: (a) to make distributions to investors, thereby giving the false impression that he was generating returns, (b) to pay his own living expenses, (c) to speculate in commodities trades, in the process losing roughly $4 million, (d) to invest approximately $1,200,000 in a retail bakery business, and (e) to design and build custom sports cars. On February 21, 2008, Viola also used $1,007,600[3] to purchase preferred stock of Citigroup through an investment brokerage account managed by

---

[3] At one point the Second Amended Complaint references a $1,007,800 transfer. This appears to be a typographical error, as Exhibit 5 to the Second Amended Complaint, referenced as evidence for this transaction, indicates a value of $1,007,600.

3

CGMI. Both Citibank and CGMI are subsidiaries of Citigroup, a holding company.

Due to the increased account balances in early 2005, and pursuant to the terms of the Patriot Act, Citi required updated account information forms for the trust accounts, which Viola fraudulently filled out on behalf of Napolitano, signing Napolitano's name and giving his own address and phone number for Napolitano's, who was dead. With this information, Viola was permitted to continue operating the trust accounts and to transfer millions of dollars through the accounts, which had a high balance of $9,452,583.34 on February 21, 2008. These transfers included a $4,810,553 transfer to a commodities brokerage. When the commodities brokerage firm became concerned over the size of Viola's losses, Citi provided two letters of reference on his behalf in October of 2008, attesting to Viola and Napolitano's wealth, sophistication, and integrity. Citi also assured two of Viola's victims that Schrammel, the successor trustee of the accounts, could act in the event that Viola was not able.

Citi provided Viola with other assistance, including false representations to victims that Viola was a practicing attorney and a skilled investment advisor, and assuring Citi customers that allocating portions of the victims' investment portfolios to aggressive investment with Viola was a sound investment strategy. Citi also permitted Viola to use its conference room to meet with victims on at least one occasion. Citi referred customers to Viola. For example, when Citi customer Morton Kirsch sought to repatriate approximately $8 million of his

4

offshore funds to his own account, Schrammel referred him to Viola as one who was experienced in international money transfers.

Citi eventually approached Viola to request additional documentation after Citi's compliance department flagged the $8 million foreign wire transfer from Kirsch and acknowledged that the transactions in general were wholly inconsistent with a personal trust account. Viola refused to cooperate, and Citi closed the accounts after sixty days, during which time Viola disbursed an additional $912,240.22. Viola continued to operate the Ponzi scheme for another six months, through other Citi accounts that were opened with Schrammel's assistance, until Viola's arrest and his involuntary chapter 7 petition filed on March 16, 2010.

Following the involuntary filing, an order for relief was entered and Hoskins was appointed chapter 7 Trustee. After investigation, Hoskins filed an adversary complaint and then a First Amended Complaint naming the Citi defendants and raising two claims for avoidance of fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A) and 544(b)[4] and a third claim for damages for aiding and abetting fraudulent transfers under § 544(a)(2). On September 10, 2010, Citi brought a motion to dismiss the First Amended Complaint. The bankruptcy court granted the motion with leave to amend on the grounds that Viola, not Citi, controlled the funds in the trust accounts; accordingly, Hoskins could not bring an action against Citi as a non-transferee. Further, the

---

[4] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

5

court found that Hoskins lacked standing to assert a claim for aiding and abetting a fraudulent transfer. Hoskins then filed the Second Amended Complaint realleging the dismissed claims and adding a fourth claim for avoidance of Viola's purchase of Citigroup preferred stock. The court granted Citi's motion to dismiss the Second Amended Complaint with prejudice for the reasons stated in its previous Memorandum Decision, with the added reason that § 546(e) precluded the fourth claim. Hoskins appealed.

## II. ISSUES

A. Are Citigroup, CGMI, and/or Citibank transferees for the purposes of imposing fraudulent transfer liability?

B. Does a bankruptcy trustee have standing to bring a claim for relief alleging the aiding and abetting of fraudulent transfers under California law?

C. Do the provisions of § 546(e) apply to protect Citigroup from liability in connection with a sale of its own stock through its subsidiary, CGMI?

## III. JURISDICTION

The bankruptcy court properly exercised jurisdiction under 28 U.S.C. § 157(b)(2)(E), and § 1334. We have jurisdiction under 28 U.S.C. § 158.

## IV. STANDARD OF REVIEW

The BAP reviews de novo a bankruptcy court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Busseto Foods, Inc. v. Laizure (In re Laizure), 548 F.3d 693, 696 (9th Cir. 2008). When reviewing a motion to dismiss a complaint, the court must take as true all allegations of material fact and construe them in a light most favorable to the nonmoving party. Parks Sch. of Bus., Inc. v. Symington, 51

6

F.3d 1480, 1484 (9th Cir. 1995) (citation omitted). For a complaint to survive a motion to dismiss, alleged facts must be plausibly suggestive of a claim entitling the plaintiff to relief. Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009). A plaintiff's complaint may be dismissed either for failing to articulate a cognizable legal theory or for failing to allege sufficient facts under a cognizable legal theory. Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).

## V. DISCUSSION

A.  The Citi Defendants Are Not Transferees Pursuant To The Ninth Circuit's Dominion Test.

Hoskins' first and second claims for relief against Citi in the Second Amended Complaint are for avoidance of intentionally fraudulent transfers under §§ 548(a)(1)(A) and 544(b). These sections permit the trustee to avoid a transfer of an interest of the debtor in property made with the actual intent to hinder, delay, or defraud a creditor within two years prior to the bankruptcy filing, and to avoid any transfer of such an interest that is voidable under applicable law by an unsecured creditor. Pursuant to § 550(a), a trustee may recover a fraudulent transfer from "the initial transferee of such transfer or the entity for whose benefit such transfer was made; or any immediate or mediate transferee of such initial transferee." The term "transferee" is not defined in the Bankruptcy Code; however, the Ninth Circuit has examined the question of who constitutes a transferee at length.

As explained in In re Incomnet, Inc., 463 F.3d 1064, 1069

7

(9th Cir. 2006), there are two generally recognized tests to determine if a party is a transferee: the "dominion test" and the "control test." Perhaps because the words are usually synonyms, the tests have frequently been conflated, but as explained in Incomnet, the Ninth Circuit "ha[s] applied the dominion test several times, but ha[s] declined to adopt the control test." Id. The Ninth Circuit's dominion test defines a transferee as one who "has dominion over the money or other asset, the right to put the money to one's own purposes. . . . The inquiry focuses on whether an entity had legal authority over the money and the right to use the money however it wished." Id. at 1070 (internal citations omitted).

The Ninth Circuit has identified Bonded Financial Services, Inc. v. European American Bank, 838 F.2d 890 (7th Cir. 1988), as the leading case in this area. Incomnet, at 1070. In Bonded Financial, a bank was held not to be a transferee under § 550(a), even though the debtor, a corporation, sent the bank a check payable to the bank's order, because the check was accompanied by a note directing the bank to deposit the check into another account belonging to the debtor's principal. 838 F.2d at 891. The Seventh Circuit found that the bank received no benefit from the transaction in which it served merely as a financial intermediary; accordingly, the scenario failed the dominion test, which stresses the ability of the recipient to use the money as it chooses. Id. at 893.

The Ninth Circuit in Incomnet emphasized that the dominion test is more restrictive than the "control test" used by other circuits, referencing the explanation of the control test laid

8

out in Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1199 (11th Cir. 1988). Incomnet, 463 F.3d at 1071. Under the control test, an examining court must evaluate a transaction in its entirety and make a "logical and equitable" determination as to whether "the banks actually controlled the funds or merely served as conduits, holding money that was in fact controlled by either the transferor or the real transferee." Chase & Sanborn Corp., 848 F.2d at 1199-1200. Therefore, while similar, "[t]he dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit. The control test takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question." Incomnet, 463 F.3d at 1071 (internal citations omitted).

Hoskins' Second Amended Complaint fails to demonstrate that any of the Citi defendants had dominion over the funds transferred to the trust accounts with Citibank and CGMI. To the contrary, the complaint reflects that Viola had dominion over the funds, or in other words, the legal title and ability to do with them whatever he wished, much to the chagrin of his duped investors. Hoskins has argued that, because a Citi employee, Schrammel, was designated as successor trustee to the trust accounts, Citi should be viewed as having exercised dominion over the funds. In the alternative, Hoskins argues that Citi should be deemed to have exercised dominion over the funds in light of its continued violations of rules and regulations in permitting the accounts to operate unlawfully.

Unfortunately for Hoskins, the Ninth Circuit has been clear

9

regarding its adoption of the dominion test and corresponding rejection of the "more lenient" control test. Incomnet, 463 F.3d at 1071. Although it is a disturbing fact that Schrammel, a Citi branch vice president, was designated as successor trustee, the complaint does not allege that Schrammel served as trustee at any time, nor that he had "sufficient authority over the funds to direct their disbursement." Id. at 1074.

The allegations that Citibank ignored multiple red flags and permitted glaring regulatory violations, thereby facilitating the continuation of Viola's fraud, are also disturbing. It is possible that the Citi defendants may be subject to liability under state or federal law as a consequence of these violations. However, the failure of Schrammel or any of the Citi defendants to exercise dominion over the trust accounts determines the issue of liability for fraudulent transfer under the Bankruptcy Code and the Ninth Circuit dominion test.

The bankruptcy court correctly determined that the Citi defendants are not transferees under § 550(e) pursuant to current binding precedent; accordingly, the dismissal of Hoskins first and second claims for relief is affirmed.

B. The Trustee Does Not Have Standing To Bring A Claim For Relief For Aiding And Abetting Fraudulent Transfers Because The Trustee Is Not A Real Party In Interest.

Hoskins' third claim for relief attempts to invoke the trustee's "strong arm" powers under § 544(a)(2), which gives the

10

trustee

> . . .
> the rights and powers of, or [the power to] avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by -- . . .
> (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists . . . .

§ 544(a)(2). Hoskins refers to the strong arm powers granted in this section as those of the "hypothetical execution lien creditor." These powers, as Hoskins correctly asserts, go beyond mere avoidance powers. However, they do not establish Hoskins' right to a claim for relief in this case under Ninth Circuit precedent.[5]

Congress granted these "rights and powers" primarily to facilitate a trustee's pursuit of leviable assets. Section 544(a)(2) was particularly intended to give a trustee, standing in the shoes of a creditor that has already exhausted available

---

[5] For the purposes of analyzing Hoskins' argument, we assume that § 544(a)(2) powers are available to Hoskins in this case. We note, however, that there is some ambiguity in this Circuit's case law as to whether a creditor must exist who had the legal right to an execution at the time the bankruptcy case was filed, but simply failed to obtain said execution. See Pac. Fin. Corp. v. Edwards, 304 F.2d 224, 228 (9th Cir. 1962); see also In re Skipwith, 9 B.R. 730, 737 (Bankr. S.D. Cal. 1981) (noting criticism of the Pacific decision) (overruled on other grounds by Emmerich v. Lampi, 19 B.R. 666 (9th Cir. BAP 1982)); 124 Cong. Rec. 32400 (1978) (suggesting that the Bankruptcy Code overrules Pacific Finance Corp. insofar as it held that the trustee did not have the status of a creditor who extended credit immediately prior to the commencement of the case). It is not necessary for us to resolve this ambiguity in light of our conclusion that these powers, if granted, would still not allow Hoskins to pursue a claim against the Citi defendants for aiding and abetting fraudulent transfers.

11

legal remedies, power to pursue equitable remedies in the context of discovery.  See S. Rep. No. 89-1159 (1965), reprinted in 1966 U.S.C.C.A.N. 2032, at 2466.   Hoskins asks this Panel to interpret § 544(a)(2) to give a trustee all the substantive rights of the hypothetical execution lien creditor, which in California include standing to bring a claim for relief for aiding and abetting fraudulent transfers against a third party. See Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003).  Other courts within the Ninth Circuit have declined to grant a trustee standing to pursue such a claim, albeit under a different subsection of the strong arm statute. See Wyle v. Howard, Weil, Labouisse, Friedrichs Inc. (In re Hamilton Taft & Co.), 176 B.R. 895, 902 (Bankr. N.D. Cal. 1995) (holding that the trustee did not have power to pursue an aiding and abetting claim for relief under § 544(b)); Ciolino v. Ryan (In re Ryan), 2008 Bankr. LEXIS 2968 at *10 n.5 (Bankr. N.D. Cal. Oct. 29, 2008) (same).

Hoskins attempts to distance her claim from these rulings by emphasizing the differences between § 544(a), the basis for her claim, and § 544(b), the basis for the claims in In re Hamilton Taft & Co. and Ryan.  This attempt is futile in light of the factual similarities between her claim and that raised in Williams v. California 1st Bank, 859 F.2d 664 (9th Cir. 1988). In addition to having a nearly identical factual scenario, the reasoning of the Ninth Circuit's interpretation of Supreme Court precedent is as applicable to this case as it was to Williams.

In Williams, the Ninth Circuit considered a bank's motion to dismiss the trustee's action against the bank for violation of

12

the federal securities laws on behalf of creditors who had been bilked in a Ponzi scheme. Id. at 665. In response to the bank's assertion that the trustee did not have standing to bring such a suit, the trustee obtained an assignment of the claim from some of the investors. Id. Nonetheless, the Ninth Circuit concluded that under the Supreme Court's decision in Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 428-30 (1972), the trustee did not have standing to pursue the claim against the bank and the case should be dismissed.

The Ninth Circuit gave three specific reasons for dismissal. First, the trustee did not have power to collect money not owed to the estate: the court reasoned that the assignment of their claims notwithstanding, the investors remained the real parties in interest. Williams, 859 F.2d at 666-67. Second, the debtor had no independent claim against the bank. Id. at 667. Third, allowing the trustee to bring a suit raised the potential for inconsistent actions between the trustee and those investors who had not assigned their claims, potentially creating a conflict of interest and the proliferation of litigation. Id. The court further noted that Congress had the opportunity in 1978 to overturn Caplin, which had first raised these three points in denying a trustee the authority to recover damages, and decided not to do so. Accordingly, "'Congress' message is clear -- no trustee, whether a reorganization trustee as in Caplin or a liquidation trustee [,] has power under . . . the Code to assert general causes of action . . . on behalf of the bankrupt estate's creditors.'" Id. at 667 (quoting In re Ozark Rest. Equip. Co., 816 F.2d 1222, 1228 (8th

13

Cir. 1987)).

The reasoning of Williams applies to this case. First, any recovery of funds from the Citi defendants will go straight to the investors, apart from administrative costs that Hoskins may recoup as the cost for bringing the suit. Second, Viola's estate has no independent claim against the Citi defendants. Hoskins cannot bring a claim on behalf of the estate against the bank for the bank's alleged complicity with Viola's fraudulent activities. Finally, allowing Hoskins to go forward with her suit against the Citi defendants raises the risk of inconsistent actions brought outside of bankruptcy by the investors themselves.

In the Ninth Circuit, "it is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the [debtor] itself." Smith v. Arthur Andersen LLP, 421 F.3d 989, 1002 (9th Cir. 2005) (internal citations omitted); see also In re Hamilton Taft & Co., 176 B.R. at 902 ("A debtor's bankruptcy trustee . . . is not authorized to pursue every action that creditors of the debtor might pursue."). Hoskins' claim against the Citi defendants for aiding and abetting fraudulent transfers is entirely derived from the creditor investors, and would not exist but for their existence and involvement in the bankruptcy. For the reasons laid out in Caplin and adopted by the Ninth Circuit in Williams, we must conclude that Hoskins does not have standing to pursue this claim, and therefore we affirm the dismissal of Hoskins' third claim for relief.

C. The Trustee Cannot Avoid The Transfer Of $1,007,600 For Citigroup Stock Because The Transfer Was Made Through CGMI, A

14

Protected Entity Under § 546(e).

Hoskins' fourth and final claim for relief against the Citi defendants seeks to avoid Viola's 2008 transfer of $1,007,600 for the purchase of Citigroup's preferred stock.[6] This transfer falls outside of the statutory period in § 548(a)(1)(A), having occurred more than two years before the petition was filed. Accordingly, Hoskins seeks to avoid the transfer under § 544(b).

Section 546(e) limits the trustee's power to avoid transfers made by, to, or for the benefit of, certain entities, including stockbrokers and financial institutions. Specifically, the section states:

> Notwithstanding section[ ] 544 . . . , the trustee may not avoid a transfer that is . . . a settlement payment . . ., made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case.

§ 546(e). Hoskins has conceded that CGMI is an entity covered under the safe harbor of § 546(e). However, she does not concede that Citigroup, the parent holding company of CGMI and Citibank, is so protected.

Instead, Hoskins argues that CGMI should be treated as a "mere conduit," consistent with the bankruptcy court's prior

---

[6] This transfer is treated differently from those raised under Hoskins' first and second claims for relief, because in this case the Citi defendants are transferees under § 550(a), having received the cash in exchange for stock, and accordingly obtained legal right to do as they wished with the cash.

15

determination regarding the dismissal of her first and second claims for relief, which this court has affirmed. Hoskins argues under this reasoning that Citigroup, the seller of the preferred stock, is the true transferee. She further argues that Citigroup is not protected under § 546(e), and so the claim for relief should move forward.

Hoskins' "mere conduit" argument fails for two reasons. First, there is nothing in the Bankruptcy Code or subsequent case law to suggest that the Ninth Circuit's test to determine a transferee under § 550(a) should be applied as a limitation to the safe harbor provisions of § 546(e). The two sections do not cross-reference, and they explain different subjects: § 546(e) deals with transfers, while § 550(a) deals with transferees. Second, even under the Ninth Circuit's dominion test, CGMI would be considered a transferee for the $1,007,600 transaction. CGMI received the investor money from the Citi trust accounts in payment for the Citigroup stock, and then had legal authority to do what it wished with that money. This is unlike CGMI or Citibank's mere holding of trust account funds, which Viola controlled and transferred as he wished.

As was noted in oral argument, Hoskins unfortunately has been caught between two statutory provisions--the safe harbor clause of § 546(e), and the statutory limits of § 548(a)(1)(A). Her argument that "Section 546(e) should not be used as a free pass to avoid liability in a scheme to defraud" is appealing. However, the drafters of the Bankruptcy Code have already provided a limitation on § 546(e) to that effect. Any avoidance action arising under § 548(a)(1)(A) that concerns transfers made

16

"with actual intent to hinder, delay, or defraud," is exempt from § 546(e) protections. However, § 548(a)(1)(A) is limited to transactions made within two years before the bankruptcy filing date. In this case, the filing date was March 16, 2010. The transaction that Hoskins seeks to avoid took place on February 21, 2008, more than two years prior to the bankruptcy filing, and is accordingly outside of the § 548(a)(1)(A) statutory period.

It is not the place of this Panel to read in an expansion of clear statutory limits in response to this factual scenario. See In re Hamilton Taft & Co., 176 B.R. at 901 (finding that the ethical nature of a transaction outside the statutory period of exemption under § 546(e) is irrelevant to the court's determination). Accordingly, the bankruptcy court's dismissal of this claim for relief is affirmed.

## VI. CONCLUSION

For the foregoing reasons, the bankruptcy court's dismissal with prejudice of Hoskins' case for failure to state a claim is AFFIRMED.

HOLLOWELL, Bankruptcy Judge, concurring:

I agree with the majority that Hoskins cannot assert an aiding and abetting claim under § 544(a)(2) because the estate has no claim against the Appellees. The rights of a hypothetical lien creditor are dependent on the rights of its debtor. Smith v. Arthur Andersen LLP, 421 F.3d 989, 1002 (9th Cir. 2005) citing Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991). Here, because the deposits at

17

issue were not made by Viola, the Citi defendants did not become the obligors of Viola.[1] Certified Grocers, 150 Cal.App.3d at 286 ("When a bank receives deposits, it becomes the debtor of the depositor and its implied contract with him is to discharge that indebtedness by honoring such checks as he may draw upon it; the bank is not entitled to debit his account with payments not made by his order or direction."). Even if Viola had been the depositor, the facts do not indicate that Viola had a claim against the Appellees. Accordingly, the equitable remedies made available to a judgment creditor whose execution is returned unsatisfied, such as the right to bring a creditor's bill, or seek a receivership, or bring an action for aiding and abetting, could not be exercised by Hoskins against the Appellees.

If, however, Viola had a valid claim against the Appellees, then the holding in Williams v. Cal. 1st Bank, 859 F.2d 664 (9th Cir. 1988), and its progeny, barring claims against third parties by a trustee would not apply. Smith, 421 F.3d at 1002 ("If the debtor suffered an injury, the trustee has standing to pursue a claim seeking to rectify such injury."). For example, in such a case, defendants would not necessarily be able to assert an in pari delicto defense if state law bars such a defense against receivers. See Mosier v. Stonefield Josephson, Inc., 2011 WL 5075551 *4 (C.D. Cal. Oct. 25, 2011). Nor, if the

---

[1] The deposits were either in the name of the Napolitano Trust or a Delaware "shell" corporation. While Viola had signing authority for the accounts, the Appellees were authorized "to honor withdrawals from an account on the signatures authorized by the signature card, which serves as a contract between the depositor for the handling of the account." Certified Grocers of Cal., Ltd. v. San Gabriel Valley Bank, 150 Cal.App.3d 281, 287 (Cal. Ct. App. 1983).

18

debtor had a claim, independent of the claims of its creditors, would a trustee be prohibited from pursuing the claim just because the creditors might have similar claims. In <u>Smith</u>, the court recognized that while acts of mismanagement by an insolvent corporation indirectly injured creditors, the trustee for the debtor corporation still had standing to bring an action for breach of duty or misconduct to the debtor. 421 F.3d at 1004.

There are other important rights a trustee may assert under § 544(a) which would be unavailable under § 544(b), such as defenses to a claim that the statute of limitations has expired. <u>Collins v. Kholberg & Co. (In re Sw. Supermarkets, LLC.)</u>, 325 B.R. 417, 427 (Bankr. D. Ariz. 2005)

I note the differences between § 544(a) and (b) not because the majority's analysis is incorrect. On the facts of this case, no other result is possible. Nevertheless, the difference between a trustee's § 544(a) and (b) powers is worth noting because, depending on the facts of a particular case, that difference may significantly impact a trustee's ability to recover assets.