**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN THE MATTER OF WALLDESIGN, INC., a subchapter S. Corporation, *Debtor*, | No. 15-56220 D.C. No. 8:14-cv-01725-VAP |
| LISA ANNE HENRY, DBA Henry West Designs, *Appellant*, v. OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF WALLDESIGN, INC., *Appellee*. | |

| | |
|---|---|
| IN THE MATTER OF WALLDESIGN, INC., a subchapter S. Corporation, *Debtor*, | No. 15-56221 D.C. No. 8:15-cv-00167-VAP |
| DONALD F. BURESH, an individual; SHARON J. PHILLIPS, an individual, *Appellants*, v. | OPINION |

OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
WALLDESIGN, INC.,
                           *Appellee.*

Appeals from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted March 10, 2017
Pasadena, California

Filed October 2, 2017

Before: A. Wallace Tashima and Jacqueline H. Nguyen,
Circuit Judges and Algenon L. Marbley,[*] District Judge.

Opinion by Judge Marbley;
Dissent by Judge Nguyen

---

[*] The Honorable Algenon L. Marbley, United States District Court
Judge for the Southern District of Ohio, sitting by designation.

# SUMMARY[**]

## Bankruptcy

The panel affirmed the district court's reversal of the bankruptcy court's summary judgments in favor of the defendants in two adversary proceedings seeking recovery of fraudulent transfers.

Applying the "dominion test," the panel held that creditors who received misappropriated funds from the debtor corporation's sole shareholder, director, and president were initial transferees under 11 U.S.C. § 550(a)(1). They therefore were not entitled to the safe harbor of § 550(b)(1) for subsequent transferees, and the Committee of Unsecured Creditors could recover the funds both from the corporate cheat and those parties to whom he first made payments from the corporate account.

The panel affirmed the district court's judgments in favor of the Committee and remanded with instructions to remand both cases to the bankruptcy court for further proceedings.

Dissenting, Judge Nguyen wrote that the result of the majority's decision was not equitable. She wrote that the court should consider adopting the "control test" used by other circuits, or at least returning to a hybrid "dominion and control" approach. In addition, even applying the dominion test, the defendants were not initial transferees.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Steven J. Katzman (argued) and Anthony Bisconti, Bienert Miller & Katzman PLC, San Clemente, California, for Appellants.

John P. Reitman (argued) and Jack A. Reitman, Landau Gottfried & Berger LLP, Los Angeles, California, for Appellees.

**OPINION**

MARBLEY, District Judge:

It is said that bad facts make bad law. These appeals test that maxim against the often esoteric backdrop of the Bankruptcy Code. More specifically, the court must decide who is liable for voidable payments in bankruptcy proceedings when a debtor corporation's sole shareholder, director, and president misappropriates company funds to fuel his own version of "lifestyles of the rich and famous."

The bankruptcy court held that the Committee of Unsecured Creditors ("the Committee") could recover the fraudulently transferred funds *solely* from the corporate cheat, because the appellants were subsequent transferees who accepted the payments for value, in good faith, and without knowledge of their voidability. *See* 11 U.S.C. § 550(b)(1) (the "safe-harbor" provision).

The district court reversed, concluding that the appellants were initial transferees under § 550(a)(1) and, therefore, *not* entitled to the safe harbor under § 550(b)(1) for subsequent transferees. Under the district court's view, the Committee could recover the funds from both the

corporate cheat *and* those parties to whom he first made payments from the corporate account.

Although the equities seem harsh at first glance, our reading of the statute and the case law persuades us that the district court was correct. By enacting 11 U.S.C. § 550, Congress assigned liability for repaying voidable transfers to both the "good guys" (initial transferees, like the appellants) and the "bad guys" (those for whose benefit the transfer was made, like corporate cheats), because "good guys" who are party to those transfers generally stand in a better position to guard against corporate fraud than do unsuspecting creditors. We therefore **AFFIRM** the judgments of the district court in favor of the Committee[1] and **REMAND** these cases to the bankruptcy court for further proceedings.

## I.  BACKGROUND

Sections 544 and 548 of the Bankruptcy Code empower a liquidating trustee to enlarge the debtor's estate by invalidating fraudulent transfers of property, including money, thereby making the property a part of the debtor's estate again. 11 U.S.C. §§ 544(b)(1), 548(a)(1)(B).

Section 550, in turn, dictates who must reimburse the trustee and, through the trustee, the debtor's creditors, for those fraudulent and "avoided" transfers. *Id.* § 550. These appeals hinge on § 550 and determining whether the

---

[1] Although the trustee of the liquidation trust established by Walldesign's confirmed Chapter 11 plan has replaced the Committee as the real party in interest in these cases, all lower court proceedings and the parties' briefing on appeal still refer to the appellee as the Official Committee of Unsecured Creditors of Walldesign, Inc. For ease of reference and consistency with the record, our opinion will refer to the appellee in these cases as "the Committee" as well.

appellants were *initial* transferees of fraudulent payments under § 550(a)(1), and thus strictly liable to the Committee, or *subsequent* transferees, who may avail themselves of the safe-harbor provision of § 550(b)(1).

## A. Factual Background

Michael Bello served as the sole shareholder, director, and president of Walldesign, Inc., a California corporation that installed drywall, acoustical material, and plaster in construction projects in California, Nevada, and Arizona. Bello oversaw Walldesign's day-to-day business operations, as well as the company's finances.

Walldesign maintained its primary bank account at Comerica Bank in El Segundo, California. Walldesign generally deposited its accounts receivable in and paid its expenses from this primary account. The primary account was disclosed in the general ledger and other books and records of Walldesign. And, when Bello signed the Schedules and Statement of Financial Affairs in Walldesign's bankruptcy case, he disclosed the company's primary account in those filings.

In 2002, Bello opened a different bank account in Walldesign's name at Preferred Bank in Irvine, California. When he opened this account, Bello used Walldesign's Federal Tax I.D. Number, a Statement by Domestic Stock Corporation, Walldesign's Articles of Incorporation, a Unanimous Consent of Shareholder of Walldesign to Corporate Action, and a signature card granting him authority as an agent of Walldesign to open the account. That said, Bello used his home as the secondary account's address; he did not disclose the account in Walldesign's general ledger or other records; and he later made his wife— who was not a Walldesign employee—a signatory to the

account. Bello, moreover, tried to conceal the secondary account during Walldesign's bankruptcy proceedings.

Although most of Walldesign's income and expenses flowed through its primary account, Bello devised a system whereby rebates from the company's suppliers were deposited into the secondary account instead. Rather than deduct the rebates from Walldesign's invoice, suppliers issued checks to Walldesign for the difference. Bello then deposited the rebate checks into Walldesign's secondary account, without disclosing the deposits to the company's management, its creditors, or even the bankruptcy court. Bello channeled nearly $8 million of Walldesign funds into the secondary account in the ten years he operated it.

Bello then used the funds in Walldesign's secondary account to support his own lavish lifestyle rather than for legitimate business purposes. You name it, Bello spent it, including paying for the following: (1) to operate Bello's family vineyards; (2) to operate Bello's horseracing stable; (3) to operate other unrelated business entities Bello controlled; (4) Bello's Las Vegas casino bills; (5) Bello's personal expenses charged on his American Express credit card; (6) Bello's homeowners association and country club fees for two private golf courses; and (7) to pay for a "tasting room" property purchased by RU Investments, one of Bello's other business ventures. In total, Bello paid nearly $8 million from the secondary account to roughly 130 individuals and entities. All of the payments that Bello caused Walldesign to make from this secondary account were for his personal expenses and not for the benefit of the company or its creditors.

Bello's actions ultimately impacted the appellants, Donald Buresh and Sharon Phillips ("the Bureshes") and Lisa Anne Henry. The Bureshes are a married couple who

owned real property in St. Helena, California ("the Property"). In 2009, they sold the Property to a Bello-controlled entity, RU Investments, for roughly $220,000. The Bureshes sold the Property for a fair value and at arms' length. Over the next two years, Bello made payments to the Bureshes from checks drawn on Walldesign's secondary account. These checks all bore the name "WALLDESIGN INCORPORATED." Ultimately, Bello located a Bello Family Vineyard "tasting room" on the Property. Aside from the sale of the Property, the Bureshes had no pre-existing relationship and have no ongoing relationship with Bello, his family, or any of his businesses.

Ms. Henry is the owner of Henry West Design, a small interior design firm. She met Bello through a client, who referred her to Bello for design services on a building he (not Walldesign) owned. She provided design- and construction-related services for Bello over nine years, always at her standard rates, in arms' length transactions. Bello did not personally pay for these services; instead, he drew checks from Walldesign's secondary account, as well as from other businesses he operated. In total, Bello spent over $230,000 on Ms. Henry's design services. Aside from providing these services, Ms. Henry had no pre-existing or ongoing relationship with Bello, his family, or any of his businesses.

## B.  Procedural Background

Walldesign petitioned for bankruptcy on January 4, 2012. The Committee was appointed to represent creditors' interests a few days later. The Committee eventually brought ninety-six separate adversary proceedings to recover payments Bello made from the secondary account, including the payments to the Bureshes and Ms. Henry. All told, the Committee sought to recover $220,350.00 from the Bureshes and $232,948.16 from Ms. Henry.

The Committee also filed a complaint against Bello, his wife, and various other Bello-related individuals and entities—seeking to recover an amount equal to all identified payments made from the secondary account, including the payments made to the Bureshes and Ms. Henry.

In June 2014, the Bureshes and Ms. Henry filed motions for partial summary judgment against the Committee. The Bureshes and Ms. Henry argued that they were not liable to the Committee for any fraudulent transfers because they were not "initial transferees" under 11 U.S.C. § 550(a)(1) but, rather, were subsequent transferees entitled to the safe harbor under § 550(b)(1). The bankruptcy court granted the motions for partial summary judgment, first in an oral order on July 31, 2014, and later issued brief written orders in both cases. The Committee then appealed both orders to the district court.

On July 17, 2015, the district court reversed the decision of the bankruptcy court in the Bureshes' case (the lead case). *In re Walldesign, Inc.*, No. SACV 15-00167-VAP, 2015 WL 4399843 (C.D. Cal. July 17, 2015). The district court found the Bureshes strictly liable to the Committee because they qualified as "initial transferees" of the fraudulent payments that Bello made from Walldesign's secondary account under § 550(a)(1). *Id.* at *7. In the same order, the court administratively closed Ms. Henry's appeal for the same reason, thereby remanding both cases to the bankruptcy court for further proceedings. *Id.*

The Bureshes and Ms. Henry timely filed their notices of appeal of the district court orders.

## II.  STANDARD OF REVIEW

We review the district court's decision on an appeal from a bankruptcy court de novo.  *Barclay v. Mackenzie (In re AFI Holding, Inc.)*, 525 F.3d 700, 702 (9th Cir. 2008).  Because these appeals stem from the grant of summary judgment, we must determine whether the pleadings and supporting documents show that there is no genuine dispute as to a material fact and that the moving parties are entitled to judgment as a matter of law.  *Id.*

## III.  ANALYSIS

### A.  Statutory Scheme: The Bankruptcy Code Draws a Critical Distinction Between Initial and Subsequent Transferees.

The Bankruptcy Code draws a critical distinction between initial and subsequent transferees when it comes to the recovery of fraudulent transfers.  When a trustee has proven the avoidability of a fraudulent transfer, the trustee may recover the property (or its value) from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any [subsequent] transferee of such initial transferee."  11 U.S.C. § 550(a).  The trustee, however, may not recover the property or its value from a subsequent transferee if that transferee accepted the property "for value . . . , in good faith, and without knowledge of the voidability of the transfer."  *Id.* § 550(b)(1).

This distinction between initial and subsequent transferees is "critical."  *Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*, 127 F.3d 1195, 1197 (9th Cir. 1997).  Trustees have an absolute right of recovery against the "initial transferee" and any "entity for whose benefit such transfer was made."  *Danning v. Miller (In re Bullion*

*Reserve of N. Am.)*, 922 F.2d 544, 547 (9th Cir. 1991). While trustees "[t]heoretically" can recover from subsequent transferees as well, subsequent transferees who accepted the property "for value, in good faith, and without knowledge" of the voidability of the transfer may avail themselves of the "'good faith' defense of section 550(b)." *Id.*; *accord In re Video Depot*, 127 F.3d at 1198.

## B. Statutory Text: Who is an "Initial Transferee."

We look first to the statutory text to determine whether the Bureshes and Ms. Henry qualify as initial transferees. *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004). If the statute's text "is plain," we must "enforce it according to its terms," so long as the result is not absurd. *Id.* (quotation omitted).

In a leading case on § 550, the Seventh Circuit explained that "'[t]ransferee' is not a self-defining term; it must mean something different from 'possessor' or 'holder' or 'agent.'" *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988). The court noted that treating "anyone who touches the money" as a "transferee" could lead to "absurd results" and require "useless [analytical] steps." *Id.* To avoid this result, the court opted to "slice these [steps] off with Occam's Razor and leave a more functional rule" in their place. *Id.* Under that more functional rule, the "minimum requirement [for] status as a 'transferee' is dominion over the money or other asset," i.e., "the *right* to put the money to one's own purposes." *Id.* at 893 (emphasis added).

Our court followed suit in *Universal Service Administrative Co. v. Post-Confirmation Committee of Unsecured Creditors (In re Incomnet)*, 463 F.3d 1064 (9th Cir. 2006). There, we first noted that "Section 550(a) does not define the phrase 'initial transferee.'" *Id.* at 1069. But

rather than relying on an over-simplistic syllogism from the meaning of "transfer," as the Bureshes and Ms. Henry propose, we joined the Seventh Circuit in adopting the "dominion test." *Id.* at 1069–71 (describing *Bonded Financial Services* as "[t]he leading case" on § 550 and adopting its formulation of the "dominion test" to determine initial-transferee status). Moreover, we adopted the dominion test despite some "concerns that, by focusing on whether a party had dominion over funds, courts may lose track of the original question proposed by the statute— namely, whether a party is a transferee." *Id.* at 1073 n.11. In 2014, our court again held that "[i]n the absence of a statutory definition, we apply the so-called 'dominion test' to determine whether a party is the initial transferee." *Mano-Y & M, Ltd. v. Field (In re Mortg. Store, Inc.)*, 773 F.3d 990, 995 (9th Cir. 2014). There, we confirmed that "[t]he proper standard is the *In re Incomnet* dominion test" and that under that test, "the touchstones . . . for initial transferee status are legal title and the ability of the transferee to freely appropriate the transferred funds." *Id.* at 996.

Thus, any reliance on the meaning of "transfer" in 11 U.S.C. § 101(54)(D) is misplaced in connection with the inquiry at hand: determining whether the Bureshes and Ms. Henry qualify as "initial *transferees*" under § 550(a)(1).

### C. Under the Dominion Test, the Bureshes and Ms. Henry Qualify as "Initial Transferees."

As explained below, the Bureshes and Ms. Henry qualify as the "initial transferees" of payments made from Walldesign's secondary account under the dominion test. As such, they remain strictly liable to the Committee.

### 1.  The Dominion Test Explained

Under the dominion test, "a transferee is one who . . . has dominion over the money or other asset,"—in other words, one with "the right to put the money to one's own purposes." *In re Mortg. Store*, 773 F.3d at 995 (quoting *In re Incomnet*, 463 F.3d at 1070).  The "key[s]" to this test are "'whether the recipient of funds has legal title to them' and whether the recipient has 'the ability to use [the funds] as he sees fit.'" *Id.* (quoting *In re Incomnet*, 463 F.3d at 1071).  We further explained that, "an individual will have dominion over a transfer if, for example, he is 'free to invest the whole [amount] in lottery tickets or uranium stocks.'" *Id.* (quoting *Bonded Fin. Servs.*, 838 F.2d at 894).  "The first party to establish dominion over the funds after they leave the transferor is the initial transferee; other transferees are subsequent transferees." *Id.* (citations omitted).

In adopting the "more restrictive 'dominion test'" from *Bonded Financial Services*, our court stressed that the test "focuses on whether the recipient of funds has *legal title to them*"; that "dominion . . . *strongly correlates with legal title*"; and that "dominion . . . [is] akin to *legal control*." *In re Incomnet*, 463 F.3d at 1071, 1073 (emphasis added) (quotation omitted); *In re Mortg. Store*, 773 F.3d at 996 ("[T]he touchstones . . . for initial transferee status are *legal title* and the ability of the transferee to freely appropriate the transferred funds." (emphasis added)).

Indeed, in adopting the dominion test, we took care both to distinguish it from the often-conflated "control test," and to reject that more lenient standard for determining initial-transferee status.  *In re Incomnet*, 463 F.3d at 1069–71 (explaining that "the 'dominion test' and the 'control test,' as originally stated, are not merely different names for the same inquiry").  While the dominion test focuses on who had

"*legal authority* over the money," the control test involves a more gestalt analysis and requires courts to "view the entire transaction as a whole to determine who truly had control of the money." *Id.* at 1070 (emphasis added) (citations omitted). After noting that some courts "combined these tests" or their names, we held that the tests are distinguishable. *Id.* at 1071. We then adopted the "more restrictive 'dominion test'" and rejected the "more lenient 'control test.'" *Id.* (quotations omitted); *see also In re Mortg. Store*, 773 F.3d at 995–96 (adhering to "the pure dominion test").

### 2. Application of the Dominion Test in Corporate Misappropriation Cases: A One-Step or Two-Step Transaction?

With these considerations in mind, courts have taken two approaches when applying § 550 to fraudulent transfers involving the misappropriation of corporate funds by company directors, officers, or other insiders.

### a. The Majority Approach

Under the majority approach, or "one-step transaction" approach, courts hold that a principal of a debtor corporation who misappropriates company funds to satisfy personal obligations is *not* an initial transferee. *In re Video Depot*, 127 F.3d at 1198–99 (collecting cases); *Sklar v. Susquehanna Bank (In re Global Prot.)*, 546 B.R. 586, 622–23 (Bankr. D. N.J. 2016) (same). These courts reason that "[t]he mere power of a principal to direct the allocation of corporate resources does not amount to *legal* dominion and control," which is required for initial-transferee status. *In re Video Depot*, 127 F.3d at 1199 (emphasis added).

As the Tenth Circuit has explained, "[m]any principals presumably exercise *de facto* control over the funds of the corporations they manage" and "can choose to cause their corporations to use those funds appropriately or inappropriately." *Id.* (quoting *Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996)). But "[this] distinction is only relevant to the question whether the principal's conduct amounted to a breach of duty to the corporation." *Id.* (quotation omitted). The distinction is not relevant to whether the principal qualifies as an initial transferee. *Id.* Thus, a principal's control over the business operations of a corporation "does not, in itself, compel a finding that [the principal] had dominion . . . over the funds transferred from [the corporation] to [a third party]." *Id.* at 1200.

Three reasons support the majority approach and viewing direct corporate misappropriations as "single-step transactions." *First*, the text of § 550(a)(1) compels this result:

> Determining the *initial transferee* of a transaction is necessarily a temporal inquiry; there must be a transfer before there can be a transferee. The extent to which a principal has de facto control over the debtor before the funds are transferred from the debtor, and the extent to which the principal uses this control for his or her own benefit in causing the debtor to make a transfer, are not relevant considerations in determining the initial transferee under § 550.

*See Rupp*, 95 F.3d at 941.

In other words, the "flow of funds" matters, and "*receipt of the transferred property* is a necessary element for that

entity to be a transferee under § 550." *Id.* at 942 (emphasis added) (quotation omitted). But "[s]imply *directing* a transfer, *i.e.*, such as directing a debtor to transfer funds, is not enough." *Id.* (emphasis added) (quotation omitted).

A principal, therefore, may establish dominion "by first directing a transfer into his or her personal bank account and then making the payment from his personal account to the creditor." *See In re Video Depot*, 127 F.3d at 1199. But a principal does not establish dominion by misdirecting company funds directly to a third party for personal gain. *See id.* In that situation, the principal is not a transferee at all but, rather, is the party for whose benefit the transfer was made. *In re Global Prot.*, 546 B.R. at 624.

*Second*, the structure of § 550(a)(1) indicates that a principal does not become an initial transferee simply by using his or her control over corporate assets to effect a fraudulent transfer. *See Gen. Elec. Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas)*, 185 B.R. 801, 809–10 (B.A.P. 9th Cir. 1995); *In re Global Prot.*, 546 B.R. at 624; *In re Red Dot Scenic, Inc.*, 293 B.R. 116, 121 (Bankr. S.D.N.Y. 2003), *aff'd*, 351 F.3d 57 (2d Cir. 2003). Section 550 imposes strict liability on both initial transferees and any beneficiaries of the fraudulent transfers. 11 U.S.C. § 550(a)(1). From that starting point, the Ninth Circuit Bankruptcy Appellate Panel ("BAP") has reasoned:

> [I]f the distinction between an initial and a subsequent transferee turns on whether the party benefitting from the transfer "forced" the debtor to make the transfer, then the scope of liability under section 550 is unduly narrowed. Section 550(a)(1) subjects to strict liability not only the initial transferee, but also "the entity for whose benefit such

transfer was made." 11 U.S.C. § 550(a)(1). The party who forces a debtor to make a transfer is almost always "the entity for whose benefit such transfer was made," and thus is generally always subject to strict liability. Yet Congress intended to make initial transferees also strictly liable . . . . "The implication is that the entity for whose benefit the transfer was made is different from a transferee, immediate or otherwise." *Bullion Reserve*, 922 F.2d at 548. Consideration of whether the beneficiary of the transfer "forced" the debtor to make the transfer would collapse the two prongs of strict liability into a single party. . . . There is nothing in the statute or otherwise to justify this result.

*In re Lucas Dallas*, 185 B.R. at 809–10. This distinction between the beneficiaries of a transfer and initial transferees "thus strongly indicates that, as a general rule, beneficiaries and initial transferees are separate parties to a fraudulent transfer." *In re Red Dot*, 293 B.R. at 121.

*Third*, the policy concerns underlying § 550 counsel in favor of treating beneficiaries, initial transferees, and subsequent transferees separately and requiring "legal control" over the funds as opposed to mere "de facto" control for initial-transferee status. *In re Mortg. Store*, 773 F.3d at 997–98 & n.1; *In re Video Depot*, 127 F.3d at 1199. The alternative approach—by which "every agent or principal of a corporation [is] deemed the initial transferee when he or she effected a transfer of property in his or her representative capacity"—both misallocates the monitoring costs that § 550 sought to impose *and* deprives the trustee of a

potential source of recovery for creditors. *See In re Video Depot*, 127 F.3d at 1199; *In re Red Dot*, 293 B.R. at 121. After all, foxes (like corporate cheats) rarely guard henhouses (like corporate treasuries) with much success. *In re Mortg. Store*, 773 F.3d at 998 n.1. And Congress likely decided that "recovery from [an] embezzling principal would be difficult, thus it also made the first recipient of those funds liable to returning them." *See In re Global Prot.*, 546 B.R. at 625.

As these cases demonstrate, a corporate principal (whether a shareholder, director, officer, or other insider) who effects a transfer of company funds in his or her representative capacity does not have dominion over those funds in his or her personal capacity. Therefore, such a principal does not qualify as an initial transferee under § 550(a)(1) of the Bankruptcy Code.

### b.  The Minority Approach

To be sure, a minority of courts view misappropriation cases differently and reason that corporate principals may be strictly liable as initial transferees when they misuse company funds for personal gain. *See, e.g.*, *Internal Revenue Serv. v. Nordic Vill., Inc. (In re Nordic Vill., Inc.)*, 915 F.2d 1049, 1055 (6th Cir. 1990), *rev'd on other grounds*, *United States v. Nordic Vill., Inc.*, 503 U.S. 30 (1992).

Under this "two-step transaction" approach, the debtor company is *deemed* to have made the initial transfer to the corporate principal, thus making him or her strictly liable as the initial transferee. *See In re Nordic Vill.*, 915 F.2d at 1055 ("If Lah is viewed as having taken money illegally from Nordic, he is the 'initial transferee' and the delivery of the cashier's check to the IRS makes the IRS '[a subsequent] transferee . . . .'"); *see id.* ("If the IRS is considered as an

'immediate transferee' of Lah, the IRS can prevail if . . . it took for value, in good faith, and without knowledge of the voidability of the transfer.").

### c.  The Ninth Circuit Follows the Majority Approach

Because the minority approach suffers from several flaws, our court has rejected it. *In re Video Depot*, 127 F.3d at 1198–1200; *see In re Mortg. Store*, 773 F.3d at 995–96. For starters, the minority approach draws largely on equitable principles and a concern that seemingly "innocent" third parties will be held liable for fraudulent transfers unless corporate principals are deemed the initial transferees. *In re Global Prot.*, 546 B.R. at 624. But our court has noted that these types of "equitable considerations fit much more comfortably under the control test," which we repeatedly have rejected. *See In re Mortg. Store*, 773 F.3d at 996.

The minority approach also predates *Bonded Financial Services*, on which we have relied so heavily in adopting the dominion test, and focuses instead on the separate definition of "transfer" from 11 U.S.C. § 101(50). *E.g.*, *In re Nordic Vill.*, 915 F.2d at 1055 & n.3 (citing a pair of pre-*Bonded* district court cases for the proposition that "[t]here is substantial support for the conclusion that when a corporate officer takes checks drawn from corporate funds to pay personal debts, the corporate officer, and not the payee on the check[,] is the initial transferee").

Due to these shortcomings (and others), we have declined to follow the minority approach. In fact, in *In re Video Depot*, we acknowledged that although "the Sixth Circuit has expressed tentative support for [the minority approach], . . . no circuit has based a decision on it," and, therefore, we expressly "decline[d] to depart from the considered judgment of the other circuits." 127 F.3d at 1199

(citing *In re Nordic Vill.*, 915 F.2d at 1049). In the process, we also rejected both lower-court decisions on which the Sixth Circuit based its reasoning. *Id.* at 1198 (declining to follow both *In re Auto-Pak, Inc.*, 73 B.R. 52 (D.D.C. 1987), and *In re Jorges Carpet Mills, Inc.*, 50 B.R. 84 (Bankr. E.D. Tenn. 1985)); *see In re Nordic Vill.*, 915 F.2d at 1055 n.3 (citing *In re Auto-Pak* and *In re Jorges Carpet Mills*).

In recent years, we have moved even further away from the equitable concerns that drive the minority approach in favor of strict application of "the pure dominion test" and its focus on legal control. *See In re Mortg. Store*, 773 F.3d at 996–98 & n.1.

### 3. *Application of the Majority Approach in These Cases*

Here, application of the majority approach proves straight-forward: Bello was *not* the initial transferee of the funds in the secondary account because he lacked dominion over them. Rather than possessing legal title to the funds and the ability to freely appropriate them, Bello abused his power as a principal to direct *company* funds to third parties for his own benefit. Because "[l]egal control over the funds . . . passed directly from [Walldesign] to [the Bureshes and Ms. Henry]," Bello is not the initial transferee. *See In re Video Depot*, 127 F.3d at 1199.

Recall the facts, which are not in dispute. Bello, acting as an agent for Walldesign, established a bank account in the company's name using Walldesign's Federal Tax I.D. Number, a Statement by Domestic Stock Corporation, Walldesign's Articles of Incorporation, a Unanimous Consent of Shareholder of Walldesign to Corporate Action, and a signature card granting him signing authority as Walldesign's agent to open the secondary account. As all parties necessarily agree, the secondary account belonged to

Walldesign—not to Bello. Bello then deposited Walldesign funds (and Walldesign funds alone) into the secondary account.[2] Bello later misdirected those company funds *directly* to third parties like the Bureshes and Ms. Henry, by way of company checks clearly emblazoned "WALLDESIGN INCORPORATED," without ever depositing them in his own personal account or otherwise taking legal control of them.

This was a classic "one-step transaction"—with funds moving *from* Walldesign (the transferor) *to* the Bureshes and Ms. Henry (the initial transferees), *on behalf of* Bello (the party for whose benefit the transfers were made). Bello may have exercised de facto control over those funds as a corporate principal, but he never exercised *legal* control over them, as required for initial-transferee status. *See, e.g.*, *In re Video Depot*, 127 F.3d at 1199 (suggesting that "a principal may establish legal control and dominion by first directing a transfer into his or her personal bank account and then making the payment from his personal account to the creditor," but holding that a principal does not establish dominion simply by misdirecting corporate funds "directly from [the company] to [a third party]"); *Rupp*, 95 F.3d at 941–42 (rejecting argument that "a principal who directs and benefits from a fraudulent transfer of funds from a debtor to a third party is *ipso facto* the initial transferee" where "the debtor's funds moved directly to the third party" (quotation omitted)); *see also* 5 Collier on Bankruptcy ¶ 555.02[4][a] at 550–18 (15th ed. 1996) (explaining that although "[t]he

---

[2] The fact that Bello later decided to use the checks made payable to Walldesign for his own personal gain does not negate that the money legally belonged to Walldesign. *See* Cal. Com. Code § 3110(a) ("The person to whom an instrument is initially payable is determined by the intent of the person . . . signing as . . . the issuer of the instrument.").

Code does not define the term [] 'initial transferee' . . .
[g]enerally, the party who receives a transfer of property
*directly from the debtor* is the initial transferee" (emphasis
added)).

Thus, Bello is strictly liable as the party for whose
benefit such transfers were made, while the Bureshes and
Ms. Henry are strictly liable as initial transferees. Several
cases bear this out. In *In re Global Protection*, for example,
the bankruptcy court held that a corporate principal was *not*
the initial transferee where he misdirected company funds
*directly* to a bank to pay his personal debts because "[t]he
money never passed through [his] hands." 546 B.R. at 623.
The court instead held that the bank, as recipient of the funds,
was the initial transferee, but that both the bank and the
principal were strictly liable under § 550(a)(1). *Id.* at 625.
Likewise, in *In re Red Dot*, the court held that a corporate
principal was "the party for whose benefit the transfer was
made," and not an initial transferee, where he "caused the
debtor . . . to transfer money direct[ly] to a personal creditor"
without any "intermediary step between the Debtor's
issuance of the check and the [creditor's] receipt of the
funds." 293 B.R. at 122 (quotation omitted). There again,
the court held both parties strictly liable under § 550(a)(1).
*Id.*

Although this result may "elevate[] form over
substance," as the Bureshes and Ms. Henry suggest, form
matters a great deal in fraudulent-transfer cases due to the
policy concerns underlying § 550. *In re Video Depot*,
127 F.3d at 1199; *Richardson v. U.S. Internal Revenue Serv.
(In re Anton Noll, Inc.)*, 277 B.R. 875, 882 (B.A.P. 1st Cir.
2002) ("[D]ifferentiating between a one step and a two step
transaction has real legal significance—it is not merely an
act of upholding form over substance.").

The majority approach, which we employ, allocates the monitoring costs and risks of repayment among the parties as Congress intended. *In re Video Depot*, 127 F.3d at 1199. It would undermine § 550 to declare Bello the initial transferee because it is "unreasonable to assume" that an insider who misappropriates company funds "ha[s] the proper incentives to monitor [the company] for fraud." *See In re Mortg. Store*, 773 F.3d at 998 n.1. Appellant suggested at oral argument that Bello's wife, who also was a signatory to the secondary account, had the ability and incentive to monitor the company for fraud. This suggestion assumes facts not in the record—namely, that Bello's wife was an innocent signatory on the account, and not acting in cahoots with her husband. In truth, we have no indication what role, if any, Bello's wife played as a signatory on the account. It seems equally likely that Bello's wife knew what her husband was doing but turned a blind eye anyway.

Likewise, it is fair to view the Bureshes and Ms. Henry as the initial transferees since they "receive[d] funds directly from [the] debtor," and thus, their "capacity [and burden] to monitor . . . [were] at [their] greatest." *In re Video Depot*, 127 F.3d at 1199. Although the Bureshes and Ms. Henry suggest that they lacked the ability to monitor for fraud, the record shows otherwise. It is undisputed that the Bureshes sold their Property to a Bello-controlled entity called "RU Investments." Yet they received all payments for that sale from checks bearing the name "WALLDESIGN INCORPORATED"—providing at least *some* indication that something was amiss. Likewise, Ms. Henry performed all services for Bello in his individual capacity. Yet she received all payments from checks bearing the name "WALLDESIGN INCORPORATED" or from one of Bello's other businesses—again, providing at least *some* indication of an irregularity in the payments. As between

Walldesign's creditors, who had *no* idea of the fraudulent transfers, and the Bureshes and Ms. Henry, who had some indication of these irregularities, the Bureshes and Ms. Henry stood in a better position to monitor for fraud. *See In re Mortg. Store*, 773 F.3d at 997.

Finally, viewing the Bureshes and Ms. Henry as the initial transferees, while viewing Bello as the party for whose benefit the transfers were made, allows the Committee to recover from *all* parties under § 550(a)(1), as Congress intended. After all, "Section 550 expressly allows the trustee to recover from either party, indicating that, as a matter of policy, the option should be preserved where possible." *Rupp*, 95 F.3d at 943; *see also In re Global Prot.*, 546 B.R. at 624–25 (recognizing importance of permitting recovery from "good guys" and "bad guys" alike, because "recover[ing] from the embezzling principal would be difficult"); *In re Red Dot*, 293 B.R. at 122 (noting that "[a]n alternative result would be inconsistent with the *Bonded* [*Financial Services*] framework and would contravene the structure and purpose of section 550(a)").

### 4. The Bureshes' and Ms. Henry's Arguments to the Contrary Lack Merit

The Bureshes and Ms. Henry offer several rejoinders, but they all lack merit. *First*, they argue that we should scrap the dominion test from *In re Incomnet* in favor of the control test that the Eleventh Circuit employs. *See In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1199 (11th Cir. 1988). We have been down this road twice before, and both times, we explicitly declined similar invitations. *In re Mortg. Store*, 773 F.3d at 996 ("[I]n *In re Incomnet*, we explicitly rejected the control test's flexible, equitable approach and embraced the pure dominion test."); *In re Incomnet*, 463 F.3d at 1071 ("[W]e take care not to apply the more lenient 'control test'

put forth in *In re Chase & Sanborn Corp.*"). Because we cannot overrule a prior panel's decision without intervening Supreme Court (or en banc) precedent, this argument is a non-starter. *Koerner v. Grigas*, 328 F.3d 1039, 1050 (9th Cir. 2003) (citing *Hart v. Massanari*, 266 F.3d 1155, 1171–72 (9th Cir. 2001)). For better or worse, we must employ "the pure dominion test" in these cases. *In re Mortg. Store*, 773 F.3d at 996.

*Second*, they suggest that we should "clarify" the dominion test by confining it to cases involving "mere conduits," like banks operating under the express direction of a depositor or trustees who direct the disbursement of the funds in a trust account they manage. *See In re Incomnet*, 463 F.3d at 1073–74 (outlining two mere-conduit scenarios where dominion test is especially useful). This argument is wrong twice over.

For one thing, our decision in *In re Incomnet* began with the proposition that "[t]he dominion test we have crafted *strongly correlates with legal title*," and is "akin to *legal control*." 463 F.3d at 1073 (emphasis added) (quotation omitted). Thus, "[i]n the vast majority of cases, possessing legal title to funds will equate to having dominion over them." *Id.* Only after establishing this baseline understanding, which runs directly counter to the Bureshes' and Ms. Henry's position in these appeals, did we acknowledge that in "unusual situations" involving mere conduits, "legal title to funds and the right to put those funds to use" may be separated and, thus, "[t]he focus on 'dominion'" may be especially useful. *Id.* at 1073–74. We therefore recognized that while "conduit cases" seem "most likely to fall into the narrow set of circumstances where the identity of the transferee is sufficiently unclear as to require the application of the dominion test," that test applies with

equal force in *all* transfer cases and "is not limited to the context of 'conduit cases.'"  *Id.* at 1073 n.11.  Later, of course, we applied the dominion test in *In re Mortgage Store*, which itself was *not* a mere conduit case.  773 F.3d at 996.  Here again, a pair of prior panel decisions forecloses the Bureshes' and Ms. Henry's argument.  Legal title is the starting point to the dominion inquiry, not an afterthought. *Id.* ("[T]he touchstones in this circuit for initial transferee status are *legal title* and the ability of the transferee to freely appropriate the transferred funds." (emphasis added)).

After arguing that we should *not* apply the dominion test because these cases did not involve a conduit scenario, the Bureshes and Ms. Henry turn around and try to force the facts in these cases into *both* of the two "unusual [conduit] situations" we identified "in which legal title to funds and the right to put those funds to use have been separated." *See In re Incomnet*, 463 F.3d at 1073–74.  This attempt fails on every level.  Walldesign was not akin to a bank, operating at the direction of a depositor, because the funds belonged to Walldesign (not Bello), and there was no legal obligation for Walldesign to follow Bello's instructions.  *See In re Incomnet*, 463 F.3d at 1074 (outlining first example).  Bello may have had de facto control over the funds, but he lacked *legal* control over them.  *See Rupp*, 95 F.3d at 941.

Likewise, Bello was not akin to a trustee, "who is able to direct the disbursement of the funds in a trust account he manages, even though he does not own them."  *See In re Incomnet*, 463 F.3d at 1074 (outlining second example). This argument again conflates "control" with "dominion." Corporate principals simply do not have *unfettered legal authority* to do as they wish with company funds, the way that trustees have nearly unfettered legal authority over trust funds.  *See In re Ferrall's Estate*, 41 Cal. 2d 166, 176–77

(Cal. 1953) (noting that trustees generally have "absolute or unlimited or uncontrolled discretion" over disbursement of trust funds). Corporate principals have, at most, de facto control over company funds.

*Third*, the Bureshes and Ms. Henry argue that Bello qualifies as the initial transferee, even under the dominion test from *In re Incomnet*. They note that Bello kept the secondary account "secret" from Walldesign, that he dominated the company to use the secondary account as his own "personal piggy bank," and that he made his wife a signatory on the account, thus meeting the requisite level of "dominion" for initial-transferee status.

Make no mistake: Bello did his best to conceal the secondary account from Walldesign's books and ledgers, its employees, and even the bankruptcy court. Bello, through his oversized role at Walldesign and spendthrift ways, likewise served as a poster boy for dominating a corporation and its assets solely for personal gain. And he did make his wife a signatory on the secondary account.

But the Bureshes and Ms. Henry do not explain *why* these facts change the outcome under the dominion test. As for the secrecy of the secondary account, California law imputes to a corporation any "[k]nowledge of an officer of [that] corporation within the scope of his duties." *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 35 Cal. Rptr. 3d 31, 46 (Ct. App. 2005). This rule applies even when an owner/officer of a debtor corporation defrauds the company. *Id.* at 46–47 (collecting cases). Because Bello was the sole shareholder, director, and president of Walldesign, he acted within the scope of his duties in opening a corporate bank account—thereby imputing knowledge of the secondary account to Walldesign. *See Mem'l Hosp. Ass'n v. Pac. Grape Prods. Co.*, 45 Cal. 2d

634, 637 (Cal. 1955) ("Where the president of a corporation is also its general manager . . . he has implied authority to make any contract or do any other act appropriate in the ordinary course of its business."). In any event, the Bureshes and Ms. Henry point to no authority holding that company knowledge is the *sine qua non* for initial-transferee status in corporate misappropriation cases. Presumably, secrecy will remain a hallmark of these types of cases—whether it be secrecy in individual transactions that skim from a company account or secrecy in the underlying account itself. *See Bowers v. Atlanta Motor Speedway, Inc. (In re Se. Hotel Props. Ltd. P'ship)*, 99 F.3d 151, 152–53 (4th Cir. 1996) (explaining how corporate principal "caused an employee . . . to create certain false documents to reflect the disbursement of $22,500 as refunds of guests' deposits for group tours booked with [debtor hotel]" to hide skimming for personal gain).

Likewise, Bello's level of de facto control, while troubling, does not amount to "dominion" and initial-transferee status. A principal who "utterly dominates a corporation . . . may be forced to assume a corporation's liabilities under an alter ego theory or he may be otherwise liable for breach of fiduciary duty." *In re Red Dot*, 293 B.R. at 124. But "he does not, simply by virtue of such domination, become an initial transferee." *Id.* As the Tenth Circuit explained, "[t]he extent to which a principal has de facto control over the debtor . . . and the extent to which the principal uses this control for his or her own benefit in causing the debtor to make a transfer, are not relevant considerations in determining the initial transferee under § 550." *Rupp*, 95 F.3d at 941; *accord In re Se. Hotel Props.*, 99 F.3d at 156 (following *Rupp*'s analysis); *In re Global Prot.*, 546 B.R. at 591, 623 (concluding that corporate

principal who was "100% owner of the Debtor" nevertheless failed to qualify for initial-transferee status).

And while Bello made his wife a signatory to Walldesign's secondary account, the Bureshes and Ms. Henry did not cite any authority for the proposition that by so doing, he transformed the company's bank account into his own personal account or otherwise became an initial transferee. *See* Cal. Com. Code § 4104(a)(5) ("[Bank] 'Customer' means a person having an account with a bank or for whom a bank has agreed to collect items . . . ."); *Rodriguez*, 75 Cal. Rptr. 3d at 547 (rejecting argument that "the name on the signature card determines the identity of the [bank] customer"). Corporations, churches, associations, and other entities are free to structure their banking needs as they see fit (within the bounds of applicable banking laws), and they often add non-employees like accountants, spouses, or other closely associated individuals as signatories to their accounts. This act alone, however, does not change *legal* ownership over the depository account.

Relying on California law, the dissent argues that Bello's opening of the sham account should not be imputed to Walldesign because, by acting adversely to the corporation in opening the account, he did so in his personal capacity rather than as an officer of the company. *See* Diss. Op. at 36–37. According to the dissent, under *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 56 Cal. Rptr. 2d 756 (Ct. App. 1996) and *Rodriguez v. Bank of the West*, 75 Cal. Rptr. 3d 543 (Ct. App. 2008), Bello acted in his personal capacity despite "using his ostensible authority as Walldesign's president in opening the account." Diss. Op. at 37. While the dissent is correct that here, "[a]s in both *Software Design* and *Rodriguez*, the rogue agent opened a

secret bank account, purportedly on behalf of the principal, for the agent's own nefarious ends," *id.* at 38, *Software Design* and *Rodriguez* are distinguishable. In *Software Design*, the sham accounts were set up in the name of a fictitious entity, not the name of the corporation. *Software Design*, 56 Cal. Rptr. 2d at 476–77. And in *Rodriguez*, the law firm's office manager opened the sham accounts and forged the principal's signature on checks drawn on the accounts to steal client money. *Rodriguez*, 76 Cal. Rptr. 3d at 545. Here, by contrast, Bello opened the sham account in Walldesign's name, using Walldesign's documents, and a signature card granting Bello authority as Walldesign's agent to open the account. Thus, Bello's actions, while certainly fraudulent, do not transform the sham account into his personal account.[3]

*Fourth*, the Bureshes and Ms. Henry argue that we should follow the BAP decisions in *Poonja v. Charles Schwab & Co. (In re Dominion Corp.)*, 199 B.R. 410, 415 (B.A.P. 9th Cir. 1996) and *Ross v. John Mitchell, Inc. (In re*

---

[3] The dissent also asserts that "*Meyer [v. Glenmoor Homes, Inc.*, 54 Cal. Rptr. 786, 794 (Ct. App. 1966)] clearly rejected the majority's conclusion that a corporate officer's fraudulent transaction should be imputed to the company merely because the officer had authority to perform that type of transaction in other circumstances." Diss. Op. at 35. A close reading of *Meyer*, however, does not support this assertion. On the issue of authority, the court stated "the uncontradicted testimony shows that the directors of the corporation plaintiff never sold or authorized a sale of, the two blocks in controversy, nor did its president ever agree to sell them, and that the deed, when signed, was a blank, and was never acknowledged. Under these circumstances, the deed was . . . absolutely void . . . ." *Meyer*, 54 Cal. Rptr. at 794. Moreover, in *Meyer*, authority was a contested issue at trial. Here, Bello's authority is uncontroverted. As the dissent admits, [n]o one disputes that Bello had authority generally to open a bank account on Walldesign's behalf." Diss. Op. at 36–37.

*Deitz)*, 94 B.R. 637, 642–43 (B.A.P. 9th Cir. 1988) by declaring this a two-step transaction. As the district court properly held, however, decisions of the BAP are not binding on this court; rather, it's the other way around. *In re Mortg. Store*, 773 F.3d at 995–96 ("Although we treat the BAP's decisions as persuasive authority, we are not bound by its decisions. In fact, as the BAP has recognized, our decisions are binding precedent that the BAP must follow." (quotation omitted)). The BAP decisions cited not only predate our opinion in *In re Video Depot*; they conflict with it. *See In re Video Depot*, 127 F.3d at 1199. Accordingly, *In re Video Depot* controls, and this remains a one-step transaction because the funds "passed directly from [Walldesign] to [the Bureshes and Ms. Henry]," without Bello assuming legal dominion or control of them. *Id.*

*Finally*—and at bottom, what all of their other arguments boil down to—the Bureshes and Ms. Henry suggest that Bello was the initial transferee because any other holding would be inequitable to them. That may be so. But in any event, "[w]e need not weigh the merits of th[e] trade-off" between assigning responsibility to seemingly innocent initial transferees, like the Bureshes and Ms. Henry, and creditors, like the Committee, because Congress already performed that task for us. *In re Mortg. Store*, 773 F.3d at 997. Here, as in *In re Mortgage Store* and other cases, "[i]t would be inappropriate for us to second-guess Congress' considered judgment on this matter of policy." *Id.* at 997–98. Moreover, it's not as if by holding the Bureshes and Ms. Henry strictly liable we somehow are allowing Bello to escape scot-free. Instead, Bello remains strictly liable too as the party for whose benefit the fraudulent transfers were made. *See id.* at 994. And the Committee is limited to seeking "a single satisfaction" from Bello, the Bureshes, and Ms. Henry. 11 U.S.C. § 550(d).

In sum, we agree that the Bureshes and Ms. Henry (as opposed to Bello) qualify as initial transferees under this Circuit's dominion test. This was a classic one-step transaction.

## IV.  CONCLUSION

The Bureshes and Ms. Henry are strictly liable to the Committee as initial transferees. 11 U.S.C. § 550(a)(1). Bello is strictly liable to the Committee as the party for whose benefit the transfers were made. *Id.* And the Committee may seek a "single satisfaction" from all three parties, jointly and severally. *Id.* § 550(d).

We **AFFIRM** the judgments of the district court in favor of the Committee and **REMAND** both cases to the district court with directions to in turn remand these cases to the bankruptcy court for further proceedings consistent with this opinion.

NGUYEN, Circuit Judge, dissenting:

Bankruptcy courts "are courts of equity" that "appl[y] the principles and rules of equity jurisprudence." *Young v. United States*, 535 U.S. 43, 50 (2002) (quoting *Pepper v. Litton*, 308 U.S. 295, 304 (1939)). There is nothing equitable about today's decision.

Donald Buresh, Sharon Phillips, and Lisa Henry are not Michael Bello's family members, friends, or even close associates. They are a married couple who sold their property to Bello to fund their retirement and a small business owner who performed design and construction services for him. Unbeknownst to them, the checks with

which Bello paid them, which bore the name of his company, were in fact drawn from a sham bank account that he created to fraudulently siphon money away from his company and use for his personal expenses. Their dealings with Bello were legitimate, arms-length transactions. Yet they each now owe Bello's creditors hundreds of thousands of dollars—a ruinous sum for most retirees and small businesses. I strongly disagree with this result.

## I.

For many years, "we employed a hybrid 'dominion and control' test to identify initial transferees." *In re Mortg. Store, Inc.*, 773 F.3d 990, 996 (9th Cir. 2014) (citing *In re Video Depot, Ltd.*, 127 F.3d 1195, 1199–1200 (9th Cir. 1997)). Because the hybrid test incorporated the "pragmatic" control test used in other circuits, *id.*, it would have produced the correct result here without fuss and held Bello personally liable for his fraudulent acts as the initial transferee.

Unfortunately, in *In re Incomnet, Inc.*, 463 F.3d 1064 (9th Cir. 2006), "we explicitly rejected the control test's flexible, equitable approach and embraced the pure dominion test." *Mortg. Store*, 773 F.3d at 996. There was no reason to do so. *Incomnet*'s "resolution . . . [did] not turn on the question of which of the[] two standards governs in this circuit." *Incomnet*, 463 F.3d at 1069–70.

Here, while I disagree with the majority that the Bureshes and Henry were the initial transferees under the dominion test, the very fact of our disagreement shows how difficult it can be to determine who had legal control over funds in situations where practical control is clear. We should consider ditching the dominion test and adopting the control test used successfully by other circuits. At the very

least, we should return to a hybrid approach that allows us "to step back and evaluate a transaction in its entirety to make sure that [our] conclusions are logical and equitable." *Mortg. Store*, 773 F.3d at 996 (quoting *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1199 (11th Cir. 1988)).

## II.

Even applying the dominion test, as we must, the Bureshes and Henry were not the initial transferees. The majority concludes that Bello didn't possess legal title to the misappropriated funds or the ability to freely appropriate them because the sham bank account actually belonged to Walldesign. According to the majority, Bello merely "abused his power as a principal to direct *company* funds to third parties for his own benefit." Maj. Op. at 20. I disagree. Under the dominion test, the sham account never belonged to Walldesign.

As the majority acknowledges, in a one-step transaction, "a principal who directs a debtor corporation . . . to pay for a personal debt is not an initial transferee" because "[t]he mere power of a principal to direct the allocation of corporate resources does not amount to legal dominion and control." *Video Depot*, 127 F.3d at 1199 (citing *In re S.E. Hotel Props. LP*, 99 F.3d 151, 155–56 (4th Cir. 1996); *Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996)). Therefore, had Bello paid the Bureshes and Henry directly from Walldesign's account at Comerica Bank, the transactions unquestionably would have taken place in one step.

In a two-step transaction, "a principal may establish legal control and dominion by first directing a transfer into his or her personal bank account and then making the payment from his personal account to the creditor." *Id.* (citing *Rupp*, 95 F.3d at 939). The question here then is whether the

second account, which Bello secretly used as his "personal piggy bank" in stealing money from Walldesign, Maj. Op. at 27, should be treated as Bello's personal account or imputed to the company. In that regard, "[s]tate law . . . determines the nature and extent of a debtor's interest in property." *In re Cohen*, 300 F.3d 1097, 1104 (9th Cir. 2002) (quoting *In re Richmond Produce Co.*, 151 B.R. 1012, 1016 (Bankr. N.D. Cal. 1993)).

The majority says that "California law imputes to a corporation any '[k]nowledge of an officer of [that] corporation within the scope of his duties,'" and Bello "acted within the scope of his duties in opening a corporate bank account." Maj. Op. at 27 (quoting *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 35 Cal. Rptr. 3d 31, 46 (Ct. App. 2005)). But "in order to have authority [to act on behalf of a corporation] which is implied in fact the agent, be he president or general manager of a corporation, or both, must be performing an act which is 'appropriate in the ordinary course of its business.'" *Meyer v. Glenmoor Homes, Inc.*, 54 Cal. Rptr. 786, 794 (Ct. App. 1966) (quoting *Mem'l Hosp. Ass'n of Stanislaus Cnty. v. Pac. Grape Prods. Co.*, 290 P.2d 481, 483 (Cal. 1955)).

*Meyer* clearly rejected the majority's conclusion that a corporate officer's fraudulent transaction should be imputed to the company merely because the officer had authority to perform that type of transaction in other circumstances. In *Meyer*, the general manager had authority to buy land on the corporation's behalf and had previously done so by taking title in the name of individuals, and such transactions were sometimes signed by only one officer and did not always appear in the corporate minutes. *Id.* at 795. In the transaction at issue, the general manager secretly purchased

land for himself in exchange for a promissory note purportedly obligating the corporation.

The court held that the transaction could not be imputed to the corporation because the corporation "[n]ever engaged in transactions where it became obligated to pay for land . . . which was conveyed to another *for the use and benefit of that grantee as distinguished from the use and benefit of the corporation*." *Id.* (emphasis added). "The knowledge acquired by the agent who is acting adversely to his principal will not be attributed to the principal." *Id.* at 801 (citing *People v. Parker*, 44 Cal. Rptr. 900, 905–06 (Ct. App. 1965); *Commercial Lumber Co. v. Ukiah Lumber Mills*, 210 P.2d 276, 279 (Ct. App. 1949)); *see also Peregrine Funding*, 35 Cal. Rptr. 3d at 47 ("Nor is a corporation chargeable with the knowledge of an officer who collaborates with outsiders to defraud the corporation." (citing *Meyer*, 54 Cal. Rptr. at 801)).[1]

The circumstances here are the same. No one disputes that Bello had authority generally to open a bank account on Walldesign's behalf. But Bello's authority to do so didn't extend to opening a secret account solely for his own personal benefit at the company's expense. He owed Walldesign a fiduciary duty to act in good faith in the company's best interests. *See, e.g.*, *Sheley v. Harrop*, 215 Cal. Rptr. 3d 606, 624 (Ct. App. 2017). Because Bello

---

[1] The majority speculates that Bello's wife, who was a signatory to the sham account despite not having any affiliation with Walldesign, could have been "acting in cahoots with her husband." Maj. Op. at 23. If so, then the sham account was not attributable to Walldesign because Bello was collaborating with an outsider to defraud it. At a minimum, this is a factual issue that should be resolved by the bankruptcy court before we decide as a matter of law that the account belonged to the corporation.

was acting adversely to Walldesign in opening the sham account, he did so in his personal capacity, not as an officer of the company.

That Bello used his ostensible authority as Walldesign's president in opening the account makes no difference.  For example, in *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 56 Cal. Rptr. 2d 756 (Ct. App. 1996), a financial consultant with authority to handle a corporation's investment funds placed the funds into a brokerage account in the name of a fictitious partnership with the same name as the corporation.  He never reported the brokerage accounts to the corporation and had the monthly statements sent to a post office box that he falsely represented as the partnership's.  *Id.* at 759.  The court held that at the time of these deposits, the consultant "had *already stolen money and securities from* [*the owners*], having wrested control of these funds by placing them in bogus accounts."  *Id.* at 763.

Similarly in *Rodriguez v. Bank of the West*, 75 Cal. Rptr. 3d 543 (Ct. App. 2008), the office manager of a law firm opened two sham bank accounts in the lawyer's name and forged his signature on numerous checks that she used to steal client money from the law firm.  *Id.* at 544–45.  In rejecting the lawyer's negligence claims against the banks, the court explained that the banks had no duty to the lawyer because, despite being the named accountholder, he was not their customer:  "he did not consent to the creation of any of the accounts and, indeed, did not even know of their existence until after [the office manager's] wrongful acts were completed."  *Id.* at 546.  Instead, the office manager was the banks' true customer because she "opened accounts at banks at which [the lawyer] had no existing relationship, then converted the money to her own use."  *Id.* at 548.  The

court found these facts "indistinguishable" from *Software Design*. *Id.*

Here too, the putative accountholder, Walldesign, was not the true owner of Bello's sham bank account. As in both *Software Design* and *Rodriguez*, the rogue agent opened a secret bank account, purportedly on behalf of the principal, for the agent's own nefarious ends. As in *Rodriguez*, Walldesign had no relationship with the bank. As in *Software Design*, the account address of record—Bello's home—was one belonging to him personally rather than to Walldesign.

This was a classic two-step transaction. First, Bello converted corporate funds by transferring them into his personal account, making him the initial transferee. Then, he transferred the funds to others, including the Bureshes and Henry, who were subsequent transferees.

## III.

In arguing that Bello wasn't in the best position to monitor the fraud, the majority quips that "foxes (like corporate cheats) rarely guard henhouses (like corporate treasuries) with much success." Maj. Op. at 18 (citing *Mortg. Store*, 773 F.3d at 998 n.1). But allowing a corporate cheat to easily shift liability for his wrongdoing onto innocent third parties simply by signing the corporation's name on a secret bank account instead of his own only encourages this kind of embezzlement. As the majority notes, the Committee is entitled to a single satisfaction from Bello, on the one hand, and the Bureshes and Henry on the other. *Id.* at 33 (citing 11 U.S.C. § 550(d)). Every dollar the Committee is able to recover from the Bureshes and Henry is a dollar for which Bello is off the hook.

The majority admits that its holding "may be" inequitable, Maj. Op. at 31, but suggests that the Bureshes and Henry nonetheless should have monitored for fraud, since they "had some indication of . . . irregularities" because Bello's checks bore Walldesign's name. *Id.* at 23–24. I disagree. Businesses often pay for their executives' personal expenses, and it's not unusual for individuals to structure their transactions through corporations for tax reasons. I don't see anything inherently suspicious about Bello paying his personal debts from the account of a closely-held corporation. Recipients of such payments, like the Bureshes and Henry, are generally not well placed to question the legitimacy of a reputable organization's bank account.

I respectfully dissent.